David Lopez, Esq.
171 Edge of Woods Road
P.O. Box 323
Southampton, New York 11969-0323
Phone:      631.287.5520
Fax:        631.283.4735
E-Mail:     DavidLopezEsq@aol.com
Attorney for Plaintiff

Daniel E. Doherty, Esq.
7300 W. 110th Street, Suite 925
Overland Park, Kansas 66210
Phone:      913.338.7182
Fax:        913.338.7164
E-Mail:     ded-law@ddoherty.net
Attorney for Plaintiff  (*Pro Hac Vice* pending)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEBORAH DONOGHUE,

           Plaintiff,          07 Civil 8550 (L.B.S.)

- against -

LOCAL.COM CORPORATION and
HEARST COMMUNICATIONS, INC.,

           Defendants.

**AFFIRMATION OF DAVID LOPEZ IN OPPOSITION
TO MOTION OF HEARST COMMUNICATIONS, INC.
<u>TO DISMISS UPON THE PLEADINGS</u>**

State of New York  )
                        :ss
County of Suffolk  )

       **DAVID LOPEZ**, being duly sworn upon his oath as an attorney, affirms the following:

       1.      In preparing the First Amended Complaint in this action I consulted and relied upon copies, *inter alia* of:

            a)      The Consent To Equity Sales given by Hearst Communications, Inc. to Local.com Corporation dated as of July 31, 2007, and appended to the Form 8-K filed by Local.com Corporation with the Securities & Exchange Commission on August 1, 2007; and

            b)      The Securities Purchase Agreement between Local.com Corporation and certain investors dated July 31, 2007, and appended to the Form 8-K filed by Local.com Corporation with the Securities & Exchange Commission on August 1, 2007.

       2.      A true copy, as obtained from the web-site of the Securities & Exchange Commission, (www.sec.gov) of the Consent To Equity Sales appears at Exhibit A hereto.

       3.      A true copy, as obtained from the web-site of the Securities & Exchange Commission, (www.sec.gov) of the Securities Purchase Agreement appears at Exhibit B hereto.

       I make the foregoing affirmation and declare the foregoing to be true, intending the penalties of perjury to apply, this 28th day of February, 2008.

                                                      /s/
                                        David Lopez

# EXHIBIT A

# CONSENT TO EQUITY SALES

```
<DOCUMENT>
<TYPE>EX-4.7
<SEQUENCE>6
<FILENAME>a32441exv4w7.txt
<DESCRIPTION>EXHIBIT 4.7
<TEXT>
<PAGE>
```

Exhibit 4.7

CONSENT TO EQUITY SALES

THIS CONSENT TO EQUITY SALES (this "Consent") is made and delivered by HEARST COMMUNICATIONS, INC. (the "Undersigned") to and for the benefit of LOCAL.COM CORPORATION, a Delaware corporation (the "Company") as of this 31st day of July 2007.

RECITALS

This Consent is made with reference to the following facts and objectives:

A. The Undersigned and the Company entered into a Purchase Agreement dated February 22, 2007 and an Amendment No. 1 to Purchase Agreement dated March 29, 2007 (together, the "Agreement").

B. On July 9, 2007 the Company's Registration Statement on Form S-3 registering for resale the shares issued in connection with the Agreement was made effective by the SEC (the "Effective Date").

C. Pursuant to Section 7.9 of the Agreement the Company cannot, without the written consent of the Undersigned, issue shares of its common stock or common stock equivalents for a period of 90 days after the Effective Date.

D. The Company desires to obtain the Undersigned's written consent in order to have flexibility to effect possible financing transactions pursuant to which the Company would be permitted to issue common stock and common stock equivalents during the time period described in Section 7.9 of the Agreement (the "Equity Transactions"), it being acknowledged by the Company that the Undersigned has no knowledge of any specific transaction or financing plans that the Company may be contemplating.

E. Pursuant to the Agreement, the Company issued to the Undersigned (i) a warrant to purchase an aggregate of 597,015 shares of common stock of the Company at an exercise price (subject to adjustment) of $4.82 per share (the "Series A Warrant") and (ii) a warrant to purchase an aggregate of 597,015 shares of common stock of the Company at an exercise price (subject to adjustment) of $5.63 per share (the "Series B Warrant" and together with the Series A Warrant, the "Warrants").

F. In consideration of the Undersigned's consent to any Equity Transactions, the Company desires to reduce the exercise price per share of each of the Warrants by fifty cents ($0.50.) so that the Series A Warrant would have an exercise price of $4.32 per share and the Series B Warrant would have an exercise price of $5.13 per share.

```
<PAGE>
```

AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing recitals and the

respective promises and agreements of the parties set forth herein, the parties agree as follows:

1. DEFINITIONS. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings ascribed thereto in the Warrants.

2. CONSENT. Provided that the Company files a Form 8-K disclosing the terms of this Consent no later than 5:00 p.m., New York time, on August 1, 2007, the Undersigned hereby waives (i) the application of Section 7.9 of the Agreement to the extent that such section would prohibit the Company from engaging in any Equity Transactions during the 90 day period following the Effective Date and (ii) its Right of First Refusal pursuant to Section 7.12 of the Agreement only with respect to any Equity Transaction that occurs during the 90 day period following the Effective Date.

3. WARRANT PRICE. The Company agrees that the Warrants are hereby amended so that the exercise price per share of the Series A Warrant is decreased to $4.32 per share and the exercise price per share of the Series B Warrant is decreased to $5.13 per share. The Company agrees that the Undersigned may at any time deliver to the Company any warrant that may have been issued to the Undersigned in exchange for replacement warrants reflecting the new exercise prices without any charge to the Undersigned.

4. MISCELLANEOUS. Except as modified and amended pursuant to this Consent, the Agreement and the Warrants shall remain in full force and effect. This Consent may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. This Consent will become binding when one or more counterparts hereof, individually or taken together, will bear the signatures of all the parties reflected hereon as signatories.

5. GOVERNING LAW. This Consent shall be governed by, and construed in accordance with, the laws of the State of New York without regard to the choice of law principles thereof.

-2-

<PAGE>

IN WITNESS WHEREOF, the parties have executed this Consent as of the day and year first above written.

```
                                        LOCAL.COM CORPORATION
                                        a Delaware corporation


                                        By: /s/ Douglas S. Norman
                                            ---------------------------------
                                        Name: Douglas S. Norman
                                        Title: CFO


                                        HEARST COMMUNICATIONS, INC.
```

```
                        By: /s/ Kenneth A. Bronfin
                            ------------------------------------
                        Name: Kenneth A. Bronfin
                        Title: President Hearst Interactive Media
```

-3-

```
</TEXT>
</DOCUMENT>
```

# EXHIBIT B

# SECURITIES PURCHASE AGREEMENT

```
<DOCUMENT>
<TYPE>EX-4.1
<SEQUENCE>2
<FILENAME>a32441exv4w1.txt
<DESCRIPTION>EXHIBIT 4.1
<TEXT>
<PAGE>
```

Exhibit 4.1

SECURITIES PURCHASE AGREEMENT

SECURITIES PURCHASE AGREEMENT (the "AGREEMENT"), dated as of July 31, 2007, by and among Local.com Corporation, a Delaware corporation, with headquarters located at One Technology Drive, Building G, Irvine, California, 92618 (the "COMPANY"), and the investors listed on the Schedule of Buyers attached hereto (individually, a "BUYER" and collectively, the "BUYERS").

WHEREAS:

A. The Company and each Buyer is executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(2) of the Securities Act of 1933, as amended (the "1933 ACT"), and Rule 506 of Regulation D ("REGULATION D") as promulgated by the United States Securities and Exchange Commission (the "SEC") under the 1933 Act.

B. Each Buyer wishes to purchase, and the Company wishes to sell, upon the terms and conditions stated in this Agreement, (i) that aggregate number of shares of the Common Stock, par value $0.00001 per share, of the Company (the "COMMON STOCK"), set forth opposite such Buyer's name in column (3) on the Schedule of Buyers (which aggregate amount for all Buyers together shall be 2,356,900 shares of Common Stock and shall collectively be referred to herein as the "COMMON SHARES"), (ii) warrants, in substantially the form attached hereto as Exhibit A (the "SERIES A WARRANTS"), to acquire up to that number of additional shares of Common Stock set forth opposite such Buyer's name in column (4) of the Schedule of Buyers (as exercised, collectively, the "SERIES A WARRANT SHARES") and (iii) warrants in substantially the form attached hereto as Exhibit A (the "SERIES B WARRANTS", together with the Series A Warrants, the "WARRANTS") to acquire up to that number of shares of Common Stock set forth opposite such Buyer's name in column (5) on the Schedule of Buyers (as exercised, collectively, the "SERIES B WARRANT SHARES," and together with the Series A Warrant Shares, the "WARRANT SHARES").

C. Contemporaneously with the execution and delivery of this Agreement, the parties hereto are executing and delivering a Registration Rights Agreement, substantially in the form attached hereto as Exhibit B (the "REGISTRATION RIGHTS AGREEMENT") pursuant to which the Company has agreed to provide certain registration rights with respect to the Common Shares, and the Warrant Shares under the 1933 Act and the rules and regulations promulgated thereunder, and applicable state securities laws.

D. The Common Shares, the Warrants and the Warrant Shares collectively are referred to herein as the "SECURITIES".

NOW, THEREFORE, the Company and each Buyer hereby agree as follows:

1. PURCHASE AND SALE OF COMMON SHARES AND WARRANTS.

    (a) Purchase of Common Shares and Warrants. Subject to the satisfaction (or waiver) of the conditions set forth in Sections 6 and 7 below, the Company shall issue and sell to

```
<PAGE>
```



each Buyer, and each Buyer severally, but not jointly, agrees to purchase from the Company on the Closing Date (as defined below), (A) the number of Common Shares as is set forth opposite such Buyer's name in column (3) on the Schedule of Buyers, along with (B) Series A Warrants to acquire up to that number of Series A Warrant Shares as is set forth opposite such Buyer's name in column (4) on the Schedule of Buyers and (C) Series B Warrants to acquire up to that number of Series B Warrant Shares as is set forth opposite such Buyer's name in column (5) on the Schedule of Buyers (the "CLOSING"). The Closing shall occur on the Closing Date at the offices of Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022.

    (b) Purchase Price. The purchase price for the Common Shares and related Warrants to be purchased by each Buyer at the Closing shall be the amount set forth opposite such Buyer's name in column (6) of the Schedule of Buyers (the "PURCHASE PRICE") which shall be equal to the amount of $5.50 per Common Share and the related Warrants.

    (c) Closing Date. The date and time of the Closing (the "CLOSING DATE") shall be 10:00 a.m., New York City Time, on the date hereof (or such other date and time as is mutually agreed to by the Company and each Buyer).

    (d) Form of Payment. On the Closing Date, (i) each Buyer shall pay its respective Purchase Price to the Company for the Common Shares and Warrants to be issued and sold to such Buyer at the Closing, by wire transfer of immediately available funds in accordance with the Company's written wire instructions, and (ii) the Company shall deliver to each Buyer (A) one or more stock certificates, evidencing the number of Common Shares such Buyer is purchasing as is set forth opposite such Buyer's name in column (3) of the Schedule of Buyers, (B) a Series A Warrant pursuant to which such Buyer shall have the right to acquire such number of Warrant Shares as is set forth opposite such Buyer's name in column

below its address on the Schedule of Buyers.

(k) Prohibited Transactions. Since the Buyer was approached by the Company or the Placement Agent with respect to the transactions contemplated hereby, neither such Buyer nor any Person acting on behalf of or pursuant to any understanding with such Buyer has, directly or indirectly, effected or agreed to effect any short sale, whether or not against the box, established any "put equivalent position" (as defined in Rule 16a-1(h) under the Exchange Act) with respect to the Common Stock, granted any other right (including, without limitation, any put or call option) with respect to the Common Stock or with respect to any security that includes, relates to or derived any significant part of its value from the Common Stock or otherwise sought to hedge its position in the Securities (but not including any actions to secure available shares to borrow in order to effect short sales or similar transactions in the future) (each, a "PROHIBITED TRANSACTION"). Prior to the earliest to occur of (i) the termination of this

5

<PAGE>

Agreement or (ii) the date of the 8-K Filing as described in Section 4(i), such Buyer shall not, and shall cause any Person acting on behalf of or pursuant to any understanding with such Buyer not to, engage, directly or indirectly, in a Prohibited Transaction.

3. REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to each of the Buyers that:

(a) Organization and Qualification. Each of the Company and its "SUBSIDIARIES" (which for purposes of this Agreement means any entity in which the Company, directly or indirectly, owns capital stock or holds an equity or similar interest) are corporations duly organized and validly existing in good standing under the laws of the jurisdiction in which they are incorporated, and have the requisite corporate power and authorization to own their properties and to carry on their business as now being conducted. Each of the Company and its Subsidiaries is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction in which its ownership of property or the nature of the business conducted by it makes such qualification necessary, except to the extent that the failure to be so qualified or be in good standing would not have a Material Adverse Effect. As used in this Agreement, "MATERIAL ADVERSE EFFECT" means any material adverse effect on the business, properties, assets, operations, results of operations, condition (financial or otherwise) or prospects of the Company and its Subsidiaries, taken as a whole, or on the transactions contemplated hereby and the other Transaction Documents or by the agreements and instruments to be entered into in connection herewith or therewith, or on the authority or ability of the Company to perform its obligations under the Transaction Documents (as defined below). The Company has no Subsidiaries except as set forth on Schedule 3(a).

(b) Authorization; Enforcement; Validity. The Company has the requisite corporate power and authority to enter into and perform its obligations under this Agreement, the Registration Rights Agreement, the Irrevocable Transfer Agent Instructions (as defined in Section 5), the Warrants and each of the other agreements entered into by the parties hereto in connection with the transactions contemplated by this Agreement (collectively, the "TRANSACTION DOCUMENTS") and to issue the Securities in accordance with the terms hereof and thereof. The execution and delivery of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby, including, without limitation, the issuance of the Common Shares and the Warrants and the reservation for issuance and the issuance of the Warrant Shares issuable upon exercise of the Warrant have been duly authorized by the Company's Board of Directors and no further consent or authorization is required by the Company, its Board of Directors or its stockholders. This Agreement and the other Transaction Documents have been duly executed and delivered by the Company, and constitute the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(c) Issuance of Securities. The Common Shares and the Warrants are duly authorized and, upon issuance in accordance with the terms hereof, shall be validly issued and free from all taxes, liens and charges with respect to the issue thereof and the Common Shares

6

<PAGE>

shall be fully paid and nonassessable with the holders being entitled to all rights accorded to a holder of Common Stock. As of the Closing Date, the Company shall have duly authorized and reserved for issuance a number of shares of Common Stock which equals the number of Warrant Shares. The Company shall, so long as any of the Warrants are outstanding, take all action necessary to reserve and keep available out of its authorized and unissued Capital Stock, solely for the purpose of effecting the exercise of the Warrants, 120% of the number of shares of Common Stock issuable upon exercise of the Warrants. Upon exercise in accordance with the Warrants, the Warrant Shares will be validly

immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required.

6. CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL.

The obligation of the Company hereunder to issue and sell the Common Shares and the related Warrants to each Buyer at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion by providing each Buyer with prior written notice thereof:

(i) Such Buyer shall have executed each of the Transaction Documents to which it is a party and delivered the same to the Company.

(ii) Such Buyer shall have delivered to the Company the Purchase Price (less, in the case of Hudson Bay Capital Management LP, the amounts withheld pursuant to Section 4(g)) for the Common Shares and the related Warrants being purchased by such Buyer and each other Buyer at the Closing by wire transfer of immediately available funds pursuant to the wire instructions provided by the Company.

(iii) The representations and warranties of such Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date which shall be true and correct as of such specified date), and such Buyer shall have performed,

22

<PAGE>

satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by such Buyer at or prior to the Closing Date.

7. CONDITIONS TO EACH BUYER'S OBLIGATION TO PURCHASE.

The obligation of each Buyer hereunder to purchase the Common Shares and the related Warrants at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for each Buyer's sole benefit and may be waived by such Buyer at any time in its sole discretion by providing the Company with prior written notice thereof:

(i) The Company shall have executed and delivered to such Buyer (i) each of the Transaction Documents and (ii) the Common Shares (in such amounts as such Buyer shall request) and the related Warrants (in such amounts as such Buyer shall request) being purchased by such Buyer at the Closing pursuant to this Agreement.

(ii) Such Buyer shall have received the opinion of Rutan & Tucker, LLP the Company's outside counsel ("COMPANY COUNSEL"), dated as of the Closing Date, in substantially the form of Exhibit D attached hereto.

(iii) The Company shall have delivered to such Buyer a copy of the Irrevocable Transfer Agent Instructions, in the form of Exhibit C attached hereto, which instructions shall have been delivered to and acknowledged in writing by the Company's transfer agent.

(iv) The Company shall have delivered to such Buyer a certificate evidencing the incorporation and good standing of the Company and each of its operating Subsidiaries in such corporation's state of incorporation issued by the Secretary of State of such state of incorporation as of a date within 10 days of the Closing Date.

(v) The Company shall have delivered to such Buyer a certificate evidencing the Company's qualification as a foreign corporation and good standing issued by the Secretary of State (or comparable office) of each jurisdiction in which the Company conducts business and is required to so qualify, as of a date within 10 days of the Closing Date.

(vi) The Common Stock (I) shall be listed on the Principal Market and (II) shall not have been suspended, as of the Closing Date, by the SEC or the Principal Market from trading on the Principal Market nor shall suspension by the SEC or the Principal Market have been threatened, as of the Closing Date, either (A) in writing by the SEC or the Principal Market or (B) by falling below the minimum listing maintenance requirements of the Principal Market.

(vii) The Company shall have delivered to such Buyer a certified copy of the Certificate of Incorporation as certified by the Secretary of State of the State of Delaware within 10 days of the Closing Date.

23

<PAGE>

(viii) The Company shall have delivered to such Buyer a certificate, executed by the Secretary of the Company and dated as of the Closing Date, as to (i) the resolutions consistent with Section 3(b) as adopted by the Company's Board of Directors in a form reasonably acceptable to such Buyer, (ii) the Certificate of Incorporation and (iii) the Bylaws, each as in

effect at the Closing, in the form attached hereto as Exhibit E.

(ix) The representations and warranties of the Company shall be true and correct as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date which shall be true and correct as of such specified date) and the Company shall have performed, satisfied and complied in all respects with the covenants, agreements and conditions required by the Transaction Documents to be performed, satisfied or complied with by the Company at or prior to the Closing Date. Such Buyer shall have received a certificate, executed by the Chief Executive Officer of the Company, dated as of the Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by such Buyer in the form attached hereto as Exhibit F.



(x) The Company shall have delivered to such Buyer a letter from the Company's transfer agent certifying the number of shares of Common Stock outstanding as of a date within five days of the Closing Date.

(xi) The Company shall have obtained all governmental, regulatory or third party consents and approvals, if any, necessary for the sale of the Common Shares and the Warrants.



(xii) The Company shall have delivered to such Buyer such other documents relating to the transactions contemplated by this Agreement as such Buyer or its counsel may reasonably request.

8. TERMINATION. In the event that the Closing shall not have occurred with respect to a Buyer on or before five (5) Business Days from the date hereof due to the Company's or such Buyer's failure to satisfy the conditions set forth in Sections 6 and 7 above (and the nonbreaching party's failure to waive such unsatisfied condition(s)), the nonbreaching party shall have the option to terminate this Agreement with respect to such breaching party at the close of business on such date without liability of any party to any other party; provided, however, this if this Agreement is terminated pursuant to this Section 8, the Company shall remain obligated to reimburse the non-breaching Buyers for the expenses described in Section 4(g) above.

9. MISCELLANEOUS.

(a) Governing Law; Jurisdiction; Jury Trial. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts

24

<PAGE>

sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(b) Counterparts. This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party; provided that a facsimile signature shall be considered due execution and shall be binding upon the signatory thereto with the same force and effect as if the signature were an original, not a facsimile signature.

(c) Headings. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

(d) Severability. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

(e) Entire Agreement; Amendments. This Agreement supersedes all other prior oral or written agreements between the Buyers, the Company, their affiliates and Persons acting on their behalf with respect to the matters discussed herein, and this Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or