**EXHIBIT T-1**

Page 1

[2] UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
[3]
    DEBORAH DONOGHUE,                        :
[4]
            Plaintiff,                       :
[5]
[6]     -against-            Case No.
[7] LOCAL.COM CORPORATION and HEARST    07CIV8550(LBS)
    COMMUNICATIONS, INC.,                    :
[8]
            Defendants.                      :
[9]
[11]    DEPOSITION of DOUGLAS NORMAN, taken by
[12] Plaintiff at the offices of Kramer, Levin, Naftalis &
[13] Frankel, LLP, 1177 Avenue of the Americas, New York,
[14] New York 10036, on Thursday, May 15, 2008 commencing
[15] at 10:10 o'clock a.m., before Janine Figliozzi, a
[16] Shorthand (Stenotype) Reporter and Notary Public
[17] within and for the State of New York.

Page 2

[3] APPEARANCES:

        DAVID LOPEZ, ESQ.
[5]         Attorneys for Plaintiff
            171 Edge of Woods Road
[6]         Southampton, New York  11968

[8]     GREENBERG TRAURIG, LLP
        Attorneys for Hearst Communications
[9]         200 Park Avenue
            New York, New York  10166

    BY: ALAN MANSFIELD, Esq., of Counsel
[11]     WILLIAM A. WARGO, Esq., of Counsel

    KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP
[13]     Attorneys for Local.com
         1177 Avenue of the Americas
[14]     New York, New York  10036
[15] BY: JONATHAN L. FRIED, Esq., of Counsel

    ALSO PRESENT:

    Jack Spizz, Esq., Office of General
[18] Hearst Corporation

Page 3

*Norman*

DOUGLAS NORMAN, called as a
witness, having been first duly sworn by
Janine Figliozzi a Notary Public within
and for the State of New York, was
examined and testified as follows:

            **DIRECT EXAMINATION BY MR. LOPEZ:**
Q: Please state your name.
A: Douglas St. John Norman.
Q: Do you appear today for Local.com?
A: Yes.
Q: What is your relationship to
Local.com?
A: I am the chief financial officer
and secretary.
Q: What was your relationship to
Local.com on July 31, 2007?
A: Same.
Q: August 1, 2007?
A: Same.
Q: Did you participate in the sale
and issuance of 2,356,900 shares of common stock
by Local.com on or about July 31, August 1,
2,007?
A: Yes.

Page 4

**Norman**

Q: In what capacity did you participate?

A: Well, I helped put the whole process.

Q: You supervised the process of issuance?

A: I was one of the people, yes.

Q: Who were the others?

A: Well, there is David Katzoff who is a consultant. Then, of course, the board of directors and the other officers of the company.

Q: Did there come a time when instructions were given to Local.com's transfer agent to issue the shares?

A: Yes.

Q: Were there conditions that had to be met before the issuance of the shares?

A: Yes.

Q: Do you recall what they were?

A: There were a number of closing conditions in the securities purchase agreement. Some of those would have been receiving money, receiving a consent from Hearst, filing an 8-K regarding the consent, execution of the

Page 5

**Norman**

securities purchase agreement and all of the — all other related documents, to name some.

MR. LOPEZ: Would you mark that for identification.

(E-mail and attachment was marked as Plaintiff's Exhibit No. 1 for identification, as of this date.)

MR. MANSFIELD: Can you tell me what that is?

MR. LOPEZ: Bates No. 4.

Q: Can you identify that document?

A: Well, the cover is an E-mail from David Katzoff to Rich Tilton who is my transfer agent or the company's transfer agent, and attached is what's called transfer agent instructions and a schedule of buyers and resolutions of the board of directors.

Q: Beginning with the E-mail, is there a notation on it of the date and time it was sent?

A: July 31, 2007, 5:44 p.m.

Q: How did that notation get onto the E-mail?

Page 6

**Norman**

A: I imagine the E-mail system automatically puts it on.

Q: Taking that package of documents, in your opinion, was that an instruction to issue shares?

MR. MANSFIELD: Object to the form of the question.

Q: Was that an instruction to issue shares?

A: No.

Q: What was lacking?

MR. MANSFIELD: Object to the form of the question.

A: The closing conditions.

MR. LOPEZ: Number two.

(E-mail was marked as Plaintiff's Exhibit No. 2 for identification, as of this date.)

Q: Can you identify Plaintiff's 2?

A: This is an E-mail from David Katzoff to Rich Tilton, the company's transfer agent.

Q: Does it shed any light on whether instructions had been given for the issuance of

Page 7

**Norman**

shares?

MR. MANSFIELD: Object to the form of the question.

A: Yes.

Q: What indication does it make?

A: It says the instruction letter I sent over before actually does not instruct you to issue any shares yet, and it states, "once we received payment, I will send over an issuance letter to issue the shares".

Q: What date and time is that E-mail?

A: July 31, 2007, 6:38 p.m.

Q: When you say 6:38 p.m. —

A: Pacific.

Q: — you are dealing with Pacific time? That would be 9:38 p.m. East Coast time; is that correct?

A: Correct.

MR. LOPEZ: No. 3, please. That one is 21.

(E-mail was marked as Plaintiff's Exhibit No. 3 for identification, as of this date.)

Q: Can you identify that, Plaintiff's

Page 8

Norman

[2] 31?
[3] A: It is an E-mail from David Katzoff
[4] to Rich Tilton copying Rushika — I can't quite
[5] pronounce her last name — who is with my
[6] corporate counsel.
[7] Q: Does it constitute authority to
[8] issue shares?
[9] MR. MANSFIELD: Object to
[10] the form of the question.
[11] A: No.
[12] Q: What leads you to that belief?
[13] A: Because the closing conditions
[14] have not been met.
[15] Q: Does it not explicitly state it is
[16] not authority?
[17] MR. MANSFIELD: Object to
[18] the form of that question.
[19] A: Yes.
[20] Q: What does it say?
[21] A: "Please do not release the
[22] certificates until we give you approval."
[23] Q: What was the date and time of
[24] that?
[25] A: August 1st, 2007, 9:36 a.m.

Page 9

Norman

[2] Q: Which would be 12:46 Eastern time?
[3] A: Correct.
[4] MR. LOPEZ: Plaintiff's 4,
[5] please.)
[6]   (E-mail was marked as
[7] Plaintiff's Exhibit No. 4 for
[8] identification, as of this date.)
[9] MR. MANSFIELD: What is the
[10] Bates on that one?
[11] MR. LOPEZ: Thirty-one.
[12] Q: Can you identify that?
[13] A: It is an E-mail from David Katzoff
[14] to Rich Tilton copying Rushika.
[15] Q: Does that constitute an
[16] instruction to issue shares?
[17] MR. MANSFIELD: Objection to
[18] the form of the question.
[19] A: Yes.
[20] Q: What is the date and time of that
[21] E-mail?
[22] A: August 1st, 2007, 1:45 p.m.
[23] Q: Pacific time?
[24] A: Pacific.
[25] Q: So that would be 4:45 Eastern

Page 10

Norman

[2] time?
[3] A: Correct.
[4] MR. LOPEZ: Exhibit 5,
[5] please. This is 32.
[6]   (E-mail was marked as
[7] Plaintiff's Exhibit No. 5 for
[8] identification, as of this date.)
[9] Q: Going back for a moment to
[10] Plaintiff's 4, did you authorize Mr. Katzoff to
[11] send that, to send the authorization for
[12] issuance?
[13] A: Yes.
[14] Q: Were you present when it was sent?
[15] A: I was in the same office.
[16] Q: In the same room?
[17] A: No. He works outside of my
[18] office.
[19] Q: Going to Plaintiff's 5, can you
[20] identify that document?
[21] A: It is an E-mail from Rich Tilton
[22] to David Katzoff copying Rushika.
[23] Q: What is the substance of that
[24] E-mail?
[25] A: It refers to an attachment.

Page 11

Norman

[2] Q: What are the attachments?
[3] A: The media versions of the share
[4] certificates.
[5] Q: Showing they had been issued?
[6] A: Yes.
[7] Q: What is the time of that E-mail
[8] and date?
[9] A: August 1st, 2007, 2:44 p.m.
[10] Q: Pacific time?
[11] A: Pacific.
[12] Q: So that would be 5:44 Eastern?
[13] A: Correct.
[14] MR. LOPEZ: Plaintiff's 6.
[15]   (Submission notification was
[16] marked as Plaintiff's Exhibit No. 6
[17] for identification, as of this
[18] date.)
[19] MR. MANSFIELD: What is it?
[20] MR. LOPEZ: Fifty-three.
[21] Q: Can you identify that document?
[22] A: This is a submission notification
[23] from the SEC.
[24] Q: Does it bear a time on it for
[25] acceptance of a submission?

Page 12

Norman

[1]
[2] A: Yes.
[3] Q: What is that time?
[4] A: August 1st, 2007, 1632.
[5] Q: That would be 4:32 Eastern time?
[6] A: Correct.
[7] Q: What was submitted at that time?
[8] A: A form 8-K.
[9] Q: Was it a condition of the closing,
[10] a contractual condition, rather, of the issuance
[11] of shares that all necessary consents have been
[12] obtained?
[13] A: Yes.
[14] Q: Did those consents include a
[15] consent from Hearst Corporation to allow the
[16] funding to go forward?
[17] A: Yes.
[18] Q: Was it a term of that consent that
[19] the 8-K had to be filed before it was effective?
[20] A: Yes.
[21] Q: Is there any doubt in your mind
[22] from the documents in front of you and from your
[23] own recollection that the 8-K posted or was
[24] accepted by the Securities and Exchange
[25] Commission before issuance instructions were

Page 13

Norman

[1]
[2] given for the shares in question?
[3]   MR. MANSFIELD: Object to
[4] the form of the question.
[5] A: No.
[6] Q: No doubt whatsoever?
[7] A: No.
[8]   MR. LOPEZ: Plaintiff's 7.
[9]   (A Consent to equity sales
[10] with Bates No. 76 was marked as
[11] Plaintiff's Exhibit No. 7 for
[12] identification, as of this date.)
[13]   MR. MANSFIELD: What is it?
[14]   MR. LOPEZ: The consent
[15] appearing at — the Bates No. is 76.
[16] Q: Can you identify Plaintiff's 7?
[17] A: It is a consent to equity sales.
[18] Q: Did you sign the original of it?
[19] A: Yes.
[20] Q: Acting on behalf of Local.com?
[21] A: Yes.
[22] Q: Had you read it and understood it
[23] before signing?
[24] A: Yes.
[25] Q: At the time that you signed it,

Page 14

Norman

[1]
[2] what was your understanding of when the warrant
[3] repricing appearing at page 2, paragraph 3 would
[4] be effective?
[5] A: On July 31, 2007.
[6] Q: What was the basis of your
[7] understanding that was the case?
[8] A: Because that's the date of the
[9] document and that wasn't the date it was
[10] executed.
[11] Q: To your mind, at the time that you
[12] signed it, was paragraph 3 the repricing of the
[13] warrants in any way affected by paragraph 2, the
[14] consent provision?
[15]   MR. MANSFIELD: Object to
[16] the form of the question. The
[17] document speaks for itself.
[18]   MR. LOPEZ: I am asking for
[19] his understanding at the time he
[20] signed it.
[21] A: No.
[22] Q: No, paragraph 3 does not — is not
[23] modified by 2?
[24] A: (Non-verbal response.)
[25]   MR. FRIED: You have to

Page 15

Norman

[1]
[2] speak up. You can't just shake your
[3] head.
[4] A: No.
[5] Q: It was your understanding at the
[6] time that you signed that the warrant repricing
[7] contained in paragraph 31 was unconditional?
[8] A: It was conditioned on the consent
[9] being signed by both parties.
[10] Q: Was it conditional on the consent
[11] becoming effective, to your understanding?
[12] A: No.
[13] Q: Thank you.
[14]   MR. LOPEZ: Off the record.
[15]   (Off the record.)
[16]   MR. LOPEZ: Plaintiff's 8.
[17] It's' 66.
[18]   (Notification form was
[19] marked as Plaintiff's Exhibit No. 8
[20] for identification, as of this
[21] date.)
[22] Q: I show you Plaintiff's 8 and ask
[23] whether you can identify it?
[24] A: It's the notification form for the
[25] listing of additional shares for the NASDAQ

Page 16

Norman

[2] stock market.
[3]  Q: Does that notification form relate
[4] to the issuance of August 1 of the 2,356,900
[5] shares?
[6]  A: Yes.
[7]  Q: On its first page does it list
[8] number of shares outstanding prior to that
[9] issuance?
[10]  A: Yes.
[11]  Q: That number is?
[12]  A: 11,784,656.
[13]  Q: Again, on the first page, does it
[14] list number of shares outstanding after that
[15] issuance?
[16]  A: Yes.
[17]  Q: That number is?
[18]  A: Approximately 14,141,556.
[19]  Q: You signed that form?
[20]  A: Yes.
[21]  MR. LOPEZ: Plaintiff's 9.
[22]    (Capitalization table was
[23] marked as Plaintiff's Exhibit No. 9
[24] for identification, as of this
[25] date.)

Page 17

Norman

[2]  Q: I show you Plaintiff's 9 and ask
[3] if you can identify it?
[4]  A: It's a capitalization table.
[5]  Q: Under what circumstances was it
[6] prepared?
[7]  A: As part of my monthly close,
[8] accounting close.
[9]  Q: When was it prepared?
[10]  A: This one was prepared for the
[11] August close which would have meant it would be
[12] done sometime in early September.
[13]  Q: Of 2007?
[14]  A: Of 2007.
[15]  Q: What does it show for shares
[16] outstanding at the end of July 2007?
[17]  A: 11,789,656.
[18]  Q: What does it show for the end of
[19] month for August 2007?
[20]  A: 14,181,805.
[21]  Q: Do you believe those figures to be
[22] accurate?
[23]  A: Yes.
[24]  Q: It refers to a form 8-K that was
[25] filed on August 1, 2007. Did you compose or

Page 18

Norman

[2] write any portion of that form 8-K?
[3]  A: No.
[4]  MR. LOPEZ: No further
[5] questions. Thank you.
[6]  MR. FRIED: Do you want a
[7] break before we continue?
[8]  THE WITNESS: No.
[9]    CROSS-EXAMINATION BY MR. MANSFIELD:
[10]  Q: Good morning, Mr. Norman.
[11]  A: Good morning.
[12]  Q: You said that you are the CFO of
[13] Local.com?
[14]  A: Yes.
[15]  Q: That was the case on July 31st and
[16] August 1st, 2007?
[17]  A: Yes.
[18]  Q: Would you briefly describe what
[19] your responsibilities are as the CFO of
[20] Local.com?
[21]  A: Prepare financials, organize board
[22] meetings, adhere to corporate governance, make
[23] sure we are complying with all legal and
[24] regulatory rules and requirements, to watch over
[25] the company's assets, to do budgeting, financial

Page 19

Norman

[2] projections, to name a few.
[3]  Q: How long did you hold that
[4] position?
[5]  A: Little over five years at this
[6] point.
[7]  Q: Would you briefly describe for the
[8] record your educational background?
[9]  A: I have an undergraduate degree in
[10] business and a master's in business
[11] administration.
[12]  Q: What responsibility, if any, do
[13] you have with suspect to the issuance of shares
[14] of Local.com?
[15]  A: I would oversee the process.
[16]  Q: Who else would be involved in the
[17] process?
[18]  A: The board of directors, my
[19] corporate counsel, David Katzoff, a consultant
[20] that works for me, the transfer agent, and
[21] possibly other — probably the CEO of the
[22] company.
[23]  Q: Any one else?
[24]  A: No.
[25]  Q: Who is David Katzoff?

Case 1:07-cv-08550-LBS     Document 42-2     Filed 07/31/2008     Page 7 of 10

Page 20

Norman

[2] A: He is a consultant that works for
[3] me.
[4] Q: When you say he works for you, is
[5] he an independent contractor or does he work —
[6] A: Yes, he is an independent
[7] contractor.
[8] Q: — for Local.com?
[9] MR. SPIZZ: Let him finish
[10] his questions.
[11] Q: Have you been deposed before?
[12] A: Yes.
[13] Q: How many times?
[14] A: Once.
[15] Q: In what connection?
[16] A: In connection with the lawsuit.
[17] Q: Was it a Local.com lawsuit?
[18] A: No.
[19] Q: What is the role of David Katzoff
[20] in Local.com? You say he is a consultant; what
[21] does he do?
[22] A: He helps with preparing monthly
[23] financials. He also helps with the Securities
[24] and Exchange filings and other work that's
[25] related to being a public corporation.

Page 21

Norman

[2] Q: Does he work for a company or
[3] business?
[4] A: No.
[5] Q: He is a sole proprietor?
[6] A: Yes.
[7] Q: Does he maintain an office at
[8] Local.com?
[9] A: He has a cubicle.
[10] Q: During the time period of July 31,
[11] 2007 to August 1, 2007 did he maintain an office
[12] at Local.com?
[13] A: Yes.
[14] Q: Do you know whether the E-mails
[15] that have been produced in this case were
[16] written to or from David Katzoff from his
[17] Local.com cubicle?
[18] A: Yes.
[19] Q: Were they?
[20] A: To my recollection, they were.
[21] Q: So he was physically present at
[22] Local.com during that two-day period?
[23] A: Yes.
[24] Q: Did there come a time in
[25] preparation for this deposition that you were

Page 22

Norman

[2] shown a document demand that had been issued to
[3] Local.com?
[4] A: Yes.
[5] Q: Did you review that?
[6] A: Yes.
[7] Q: Can you tell me what steps were
[8] taken with suspect to the document demand to
[9] collect documents?
[10] A: I discussed them with counsel and
[11] I reviewed E-mails and I also discussed them
[12] with David, and I probably talked to my
[13] corporate counsel as well.
[14] Q: Did you talk to anyone at
[15] Local.com about the document demand?
[16] MR. FRIED: Other than
[17] David Katzoff whom he already
[18] testified?
[19] MR. MANSFIELD: I thought
[20] David Katzoff was a consultant who
[21] was not an employee of Local.com.
[22] MR. FRIED: You meant
[23] employed by, not present at?
[24] MR. MANSFIELD: Let's be
[25] very clear.

Page 23

Norman

[2] MR. FRIED: Okay.
[3] Q: Who employed by Local.com
[4] performed any role whatsoever with respect to
[5] complying with the document demand?
[6] A: Myself.
[7] Q: Was there anyone else?
[8] A: Not to my recollection.
[9] Q: Do you know whether anyone on the
[10] board of directors reviewed the document demand?
[11] A: No.
[12] Q: You don't know or they did not?
[13] A: No, they did not.
[14] Q: Do you know whether the CEO of the
[15] company reviewed the document demand?
[16] A: He might have.
[17] Q: To whom did you show the document
[18] demand?
[19] A: I might have shown it to the CEO.
[20] Q: Anyone else?
[21] A: I don't remember.
[22] Q: How did you go about the
[23] collection of documents once you saw the
[24] document demand?
[25] A: I reviewed my E-mails and David

Page 24

Norman

[2] reviewed his E-mails.
[3] Q: These are E-mails that David would
[4] have maintained on a Local.com server; is that
[5] right?
[6] A: The company maintains them on a
[7] server.
[8] Q: Other than reviewing E-mails, is
[9] there anyplace else you looked for documents
[10] responsive to the document demand?
[11] A: I looked in my file for any hard
[12] copies of documents.
[13] Q: Did you look in anyone else's
[14] files?
[15] A: No.
[16] Q: During the course of events on
[17] July 31 and August 1, 2007 do you know whether
[18] any other hard copy files of documents relating
[19] to the 2,356,900 shares would have been
[20] maintained?
[21] A: I don't believe so.
[22] Q: So you are the only one who would
[23] have had hard copy files; is that right?
[24] MR. FRIED: Object to the
[25] form.

Page 25

Norman

[2] MR. MANSFIELD: You can
[3] answer.
[4] A: Would you state the question
[5] again?
[6] Q: You are the only one at Local.com
[7] who would have had hard copy files relating to
[8] the closing on those two days?
[9] MR. FRIED: Object to the
[10] form of the question.
[11] A: There may have been hard copies on
[12] David Katzoff's desk as well.
[13] Q: The two of you would then be the
[14] only ones either employed by or affiliated with
[15] Local.com who would have had hard copies of
[16] documents relating to the closing on August 1,
[17] 2007; is that right?
[18] A: Yes.
[19] Q: Does Local.com have a stock book?
[20] A: No — can I ask a question? Can
[21] you define book?
[22] Q: Are you familiar with the concept
[23] of a stock book?
[24] A: Yes.
[25] Q: What do you understand it to mean?

Page 26

Norman

[2] A: A stock book would be a hard copy
[3] of a ledger.
[4] Q: Does Local.com to your knowledge
[5] have such a stock book?
[6] A: No.
[7] Q: Does Local.com have anything in
[8] its place?
[9] A: Yes.
[10] Q: What is that?
[11] A: An Excel spreadsheet.
[12] Q: What does the Excel spreadsheet —
[13] does it have a name?
[14] A: Yes, it does.
[15] Q: What is it called?
[16] A: Weighted Average Shares
[17] Outstanding 2007 would be the one for this.
[18] Q: That is an Excel spreadsheet
[19] that's maintained by you?
[20] A: No.
[21] Q: Who maintains it?
[22] A: David.
[23] Q: Does he maintain it on a Local.com
[24] server?
[25] A: Yes.

Page 27

Norman

[2] Q: Do you have access to it?
[3] A: Yes.
[4] Q: Do others have access to it as
[5] well?
[6] A: Yes.
[7] Q: When we are talking about David,
[8] we are talking about David Katzoff?
[9] A: Correct.
[10] Q: For how long has David Katzoff
[11] been a consultant of the company?
[12] A: About four and a half years.
[13] Q: Other than you is there anyone at
[14] Local.com with whom David works — other than
[15] you, is there anyone at Local.com with whom
[16] David works?
[17] A: Yes.
[18] Q: Who would that be?
[19] A: Most other employees in the
[20] company.
[21] Q: Does he come to Local.com on a
[22] daily basis?
[23] A: Generally, yes.
[24] Q: Describe for me what the Excel
[25] spreadsheet that is used in place of a stock

Page 28

Norman

[2] book — describe for me what its contents are;
[3] what does it reflect?
[4] A: It reflects all common stock that
[5] is issued and outstanding.
[6] Q: What is the source of information
[7] to populate the fields in that Excel
[8] spreadsheet?
[9] A: Documentation relating to equity
[10] sales.
[11] Q: What does that mean?
[12] A: For example, like the securities
[13] purchase agreement.
[14] Q: So in the normal course of
[15] Local.com business, if there is a securities
[16] purchase agreement that document would be given
[17] to David Katzoff who in turn would make entries
[18] on the Excel spreadsheet?
[19] MR. FRIED: Object to the
[20] form.
[21] A: Correct. Yes.
[22] Q: Did you understand the question?
[23] A: Yes.
[24] Q: Is that correct?
[25] A: Yes.

Page 29

Norman

[2] Q: Does anyone else make entries on
[3] that to that Excel form?
[4] A: No.
[5] Q: Have you from time to time made
[6] entries on the Excel spreadsheet?
[7] A: No.
[8] Q: Is David Katzoff directed by
[9] anyone at Local.com to make entries on the Excel
[10] spreadsheet?
[11] A: Yes.
[12] Q: Who gives David Katzoff that
[13] direction?
[14] A: Me, in some cases.
[15] Q: Anyone else?
[16] A: No.
[17] Q: Does that spreadsheet reflect
[18] warrants of Local.com?
[19] A: No.
[20] Q: Is there any other spreadsheet
[21] that's maintained by Local.com that would
[22] reflect warrants?
[23] A: Yes.
[24] Q: What is that called?
[25] A: A warrant ledger.

Page 30

Norman

[2] Q: Who maintains the warrant ledger?
[3] A: David does.
[4] Q: Is that electronic or hard copy?
[5] A: Electronic.
[6] Q: The same with the stock book
[7] spreadsheet, that is electronic, correct?
[8] A: Yes.
[9] Q: Has Local.com engaged a transfer
[10] agent?
[11] A: Yes.
[12] Q: Who is the transfer agent?
[13] A: Computer Share.
[14] Q: For how long has Computer Share
[15] been Local.com's transfer agent?
[16] A: I'm are not sure of the exact date
[17] from the fact that it used to be U.S. Stock
[18] Transfer and Computer Share purchased them
[19] sometime, I believe, in 2007.
[20] Q: If you recall, who was the stock
[21] transfer agent for Local.com on August 1st,
[22] 2007?
[23] A: U.S. Stock Transfer.
[24] Q: Is there a particular employee of
[25] U.S. Stock Transfer with whom Local.com deals?

Page 31

Norman

[2] A: Rich Tilton.
[3] Q: Anyone else at U.S. Stock with
[4] whom Local.com deals?
[5] MR. FRIED: At the time in
[6] question or now or ever?
[7] MR. MANSFIELD: On August 1,
[8] on or about August 1, 2007.
[9] A: Yes.
[10] Q: Who is that?
[11] A: The reason I said yes is if we
[12] have questions we can call up and somebody in a
[13] particular office could answer. I don't
[14] remember anybody's particular name.
[15] Q: What is Rich Tilton's role with
[16] respect to Local.com?
[17] A: I believe he is customer service.
[18] Q: What is it that the transfer agent
[19] does for Local.com? And for the purpose of
[20] these questions, I am focusing on the summer of
[21] 2007. What is the transfer agent engaged to do
[22] for Local.com?
[23] A: To effect the transfer of shares
[24] and the issuance of shares.
[25] Q: Do you know whether the transfer

### Page 32

Norman

[2] agent maintains a registry of shares of
[3] Local.com?
[4] A: Yes.
[5] Q: Does it?
[6] A: Yes.
[7] Q: Is that done in hard copy or
[8] electronic or both, if you know?
[9] A: I don't know.
[10] Q: Have you seen a copy of a
[11] registration ledger maintained by the transfer
[12] agent?
[13] A: Yes.
[14] Q: Does Local.com get copies of that
[15] on a regular basis?
[16] A: We get copies of a ledger for our
[17] annual general meeting purpose. And since we
[18] have one meeting a year, we get one each year,
[19] if that constitutes regular.
[20] Q: When is the annual meeting for
[21] Local.com?
[22] A: This next one is June 3, 2008.
[23] Q: It was the job of the transfer
[24] agent to issue certificates; is that what it
[25] does for Local.com?

### Page 33

Norman

[2] MR. FRIED: Object to the
[3] form.
[4] Q: Tell me exactly what it is that
[5] transfer agent has been engaged to do for
[6] Local.com.
[7] A: Well, again, effect the transfer
[8] of shares and/or the issuance of shares.
[9] Q: How does it go about its task of
[10] dealing with the issuance of shares? What does
[11] a transfer agent do?
[12] MR. FRIED: Object to the
[13] form.
[14] Q: Do you understand the question?
[15] A: It would issue the shares, whether
[16] it's a certificate or electronic. Depending on
[17] what the buyer requests, the transfer agent
[18] would effect that.
[19] Q: What do you mean by that?
[20] A: If we were to tell them to issue
[21] shares, they could issue either a certificate,
[22] paper certificate, or they could issue it
[23] electronically, depending on circumstances.
[24] Q: What do you mean by the electronic
[25] issuance of shares?

### Page 34

Norman

[2] A: I believe the phrase is called
[3] DTC.
[4] Q: What is your understanding of DTC?
[5] A: DTC is the shares would — the
[6] transfer agent posts in some system the shares,
[7] like the number of shares, and who — what
[8] company is issuing them, and then the buyer
[9] would go and retrieve those.
[10] Q: Alternatively, the transfer agent
[11] could issue physical certificates; is that
[12] right?
[13] A: Yes.
[14] Q: Has Local.com itself ever issued
[15] physical certificates?
[16] A: Yes.
[17] Q: Under what circumstances does
[18] Local.com issue physical certificates?
[19] A: When the company was private, the
[20] company issued physical certificates. Once the
[21] company went public, it engaged a transfer agent
[22] to handle all that.
[23] Q: At that point the company stopped
[24] issuing certificates, correct?
[25] A: Correct.

### Page 35

Norman

[2] Q: Do you know when the 2,356,900
[3] shares were first reflected on the Excel
[4] spreadsheet at Local.com?
[5] A: On August 1st.
[6] Q: At what time?
[7] A: It would be sometime after — I
[8] believe it was 1:45.
[9] Q: Did you physically make the
[10] entries?
[11] A: I did not.
[12] Q: Is it your understanding that
[13] David Katzoff made the entries?
[14] A: Yes.
[15] Q: Were you there with him when he
[16] made the entries?
[17] A: No.
[18] Q: Did he tell you when he made the
[19] entries?
[20] A: No.
[21] Q: Is there something about the —
[22] withdrawn.
[23] Is there something about the Excel
[24] ledger which would tell you when entries were
[25] made?