**EXHIBIT T-2**

Page 36

Norman

[1]
[2] A: No.
[3] Q: Are there time stamps?
[4] A: No.
[5] Q: Separate and apart from the entry
[6] on the Excel ledger, is it your testimony that
[7] the transfer agent keeps its own registry of
[8] Local.com stock?
[9] A: Yes.
[10] Q: Is it two different registries of
[11] the stock, correct?
[12] A: Correct.
[13] Q: When determinations are made as to
[14] the number of issued and outstanding shares for
[15] Local.com, what source is consulted?
[16] A: Depends.
[17] Q: Please describe.
[18] A: Well, for my reporting purpose to
[19] the SEC when calculating the weighted average
[20] shares outstanding, which I am required to do
[21] under my 10Qs and 10Ks, we can use the
[22] spreadsheet. If it has to do with the annual
[23] general meeting, I believe we would use the
[24] transfer agent.
[25] Q: Why the distinction?

Page 37

Norman

[1]
[2] A: Because I believe a record from
[3] the transfer agent is required for the general
[4] meeting, annual general meeting.
[5] Q: Required by what?
[6] A: I would imagine the SEC or NASDAQ.
[7] Q: You don't know?
[8] A: Not — no.
[9] Q: To your knowledge are the numbers
[10] the same?
[11] A: Usually.
[12] Q: Do you know whether the numbers
[13] were the same on August 1, 2007?
[14] A: No, I do not know.
[15] Q: Do you know whether the numbers
[16] were the same on July 31, 2007?
[17] A: No, they were not.
[18] Q: How do you know that?
[19] A: Because there is a document from
[20] the transfer agent that was required for the
[21] securities purchase agreement and there is a
[22] number on that, and that number is different
[23] than the document that the company keeps.
[24] Q: The Excel ledger?
[25] A: Yes.

Page 38

Norman

[1]
[2] Q: For purposes of SEC compliance
[3] reporting, the company uses the numbers found on
[4] the company's maintained Excel ledger, correct?
[5] A: Yes.
[6] MR. MANSFIELD: Why don't we
[7] mark this as — David, unless you
[8] have an objection, why don't we just
[9] continue the numbering.
[10] MR. LOPEZ: All right.
[11] MR. MANSFIELD: Make it 10.
[12] (Form 8K for Local.com was
[13] marked as Plaintiff's Exhibit No. 10
[14] for identification, as of this
[15] date.)
[16] Q: I am handing you what has been
[17] marked as Exhibit 10 —
[18] MR. FRIED: Do you have a
[19] copy for me?
[20] Q: Can you identify it?
[21] A: Its' a Form 8-K for Local.com
[22] Corporation.
[23] Q: Did you sign it?
[24] A: Yes.
[25] Q: What does it state?

Page 39

Norman

[1]
[2] A: It states the entry into a
[3] material definitive agreement regarding the
[4] issuance of shares as well as the consent to
[5] equity sales.
[6] Q: What is the date of Exhibit 10?
[7] A: Date of report says July 31.
[8] Q: Why don't you look at the
[9] signature page and tell me if that bears a date.
[10] A: Date says August 1, 2007.
[11] Q: When did you sign it?
[12] A: August 1st, 2007.
[13] Q: Is this the 8-K that was filed
[14] with the SEC at 4:32 Eastern standard time on
[15] August 1, 2007?
[16] A: Yes.
[17] Q: If I can refer you to page 4 of
[18] Exhibit 10, the first line under the title item
[19] 1.01, do you see that?
[20] A: Yes.
[21] Q: Do you see it says on August 1
[22] Local.com Corporation issued 2,356,900 shares of
[23] its common stock?
[24] A: Yes.
[25] Q: Was that statement true at the

Page 40

Norman

[2] time the 8-K was filed with the SEC?
[3] A: No.
[4] Q: Has Local.com supplemented or
[5] amended the 8-K that it filed on August 1, 2007?
[6] A: No.
[7] Q: When did Local.com first become
[8] aware that statements filed on August 1, 2007
[9] with the Securities and Exchange Commission were
[10] inaccurate?
[11] MR. FRIED: Object to the
[12] form.
[13] A: I don't believe it is inaccurate.
[14] Q: So the statement — first sentence
[15] on page 4 of Exhibit 10 is accurate —
[16] A: Well —
[17] Q: — is that correct?
[18] A: — in context it is because on
[19] August 1st we did issue them.
[20] Q: At 4:32 Eastern Standard Time had
[21] the shares been issued?
[22] MR. FRIED: Objection,
[23] asked and answered.
[24] A: No.
[25] Q: So at 4:32 was the statement

Page 41

Norman

[2] accurate?
[3] A: I guess not.
[4] Q: It's your testimony that there has
[5] been no amendment or supplement to the 8-K to
[6] correct the inaccuracy; is that correct?
[7] A: Correct.
[8] Q: Mr. Norman, what if anything did
[9] you do to prepare for today's deposition?
[10] A: I reviewed the document requests.
[11] I reviewed E-mails relating to that request. I
[12] talked with my corporate counsel.
[13] Q: Who is your corporate counsel?
[14] A: Rattan and Tucker.
[15] Q: Anyone specific?
[16] A: Yes. Derek, D-e-r-e-k, Dundas,
[17] D-u-n-d-a-s. I spoke with David Katzoff. I
[18] spoke to the two other officers of the company
[19] to let them know that I had work to do, and I
[20] believe that's it — oh, and spoke with Jonathan
[21] Fried.
[22] Q: Your counsel here at the
[23] deposition?
[24] A: Yes.
[25] Q: Did you speak with Mr. Lopez?

Page 42

Norman

[2] A: No.
[3] Q: Did you ask Mr. Dundas whether he
[4] had documents that might be responsive to the
[5] document requests?
[6] A: Yes.
[7] Q: What did he say?
[8] A: He said he would — he actually
[9] produced some.
[10] Q: Who drafted the 8-K?
[11] A: It was a collaborative effort
[12] between our corporate counsel and David Katzoff
[13] and myself.
[14] Q: Did you review it before you
[15] signed it?
[16] A: Yes.
[17] Q: The 8-K reflects a repricing of
[18] warrants owned by Hearst; is that correct?
[19] MR. FRIED: Objection. The
[20] document speaks for itself.
[21] A: Yes.
[22] Q: Are you familiar with the
[23] repricing of —
[24] A: Yes.
[25] Q: — the Hearst warrants?

Page 43

Norman

[2] A: Yes.
[3] Q: How are you familiar with them?
[4] A: I reviewed the consents as they
[5] were being drafted and I discussed with counsel,
[6] probably discussed it with the board of
[7] directors during the approval process. I think
[8] that's pretty much it.
[9] Q: Did there come a time that Hearst
[10] received repriced warrants?
[11] MR. FRIED: Object to the
[12] form.
[13] A: Yes —
[14] MR. MANSFIELD: Withdrawn.
[15] Withdrawn.
[16] Q: Did there come a time that
[17] warrants that were repriced were delivered to
[18] Hearst by Local.com?
[19] A: I believe so, yes.
[20] Q: When was that?
[21] A: I'm not sure the date that they
[22] received them.
[23] Q: What date were they delivered?
[24] A: I'm not sure what date.
[25] Q: Were they delivered after

Page 44

Norman

[2] August 1, 2007?
[3] **A:** Most likely.
[4] **Q:** Tell me what the process would be
[5] for the creation and delivery of repriced
[6] warrants to Hearst in or about August 2007.
[7] **A:** We would have to have an agreement
[8] and then we would strike the warrants from our
[9] ledger, existing ones, then reissue new ones
[10] that reflected the correct price.
[11] **Q:** So let's take this in steps.
[12] First, there would have to be an agreement,
[13] correct?
[14] **A:** Correct.
[15] **Q:** Was there such an agreement?
[16] **A:** Yes.
[17] **Q:** When was that agreement?
[18] **A:** July 31, 2007.
[19] **Q:** You said the next step would be to
[20] strike the warrants from the ledger, correct?
[21] **A:** To enter them into the ledger as
[22] well as to strike the existing ones.
[23] **Q:** What ledger are we talking about?
[24] **A:** The warrant ledger.
[25] **Q:** The warrant ledger you said is

Page 45

Norman

[2] maintained by Local.com?
[3] **A:** Yes.
[4] **Q:** Who physically would enter the new
[5] warrants into the warrant ledger?
[6] **A:** David Katzoff.
[7] **Q:** Did there come a time he did that?
[8] **A:** Yes.
[9] **Q:** When?
[10] **A:** I'm not sure.
[11] **Q:** Would he have done it only on your
[12] authorization and direction in the normal course
[13] of Local.com business?
[14] **A:** Yes.
[15] **Q:** Did there come a time that you
[16] directed him to enter the new warrants into the
[17] warrant ledger?
[18] **A:** Yes.
[19] **Q:** Do you remember when that was?
[20] **A:** No.
[21] **Q:** Would that have been done orally
[22] or in writing?
[23] **A:** Orally.
[24] **Q:** Would there be any written
[25] reflection of that oral direction?

Page 46

Norman

[2] **A:** No.
[3] **Q:** Is the warrant ledger time
[4] stamped?
[5] **A:** No.
[6] **Q:** Are entries made into the warrant
[7] ledger on a daily basis?
[8] **A:** Only when required.
[9] **Q:** After the entry of the new
[10] warrants into the warrant ledger, you said that
[11] the superseded warrants would be stricken from
[12] the ledger; is that correct?
[13] **MR. FRIED:** Are you talking
[14] generally or the specific
[15] transaction?
[16] **MR. MANSFIELD:** Let's talk
[17] generally first, then we will talk
[18] specifics.
[19] **A:** Generally, those two would happen
[20] at the same time.
[21] **Q:** What, in fact, happened with
[22] respect to the repriced Hearst warrants?
[23] **A:** I would imagine they were done at
[24] the same time.
[25] **Q:** Do you know whether they were done

Page 47

Norman

[2] the same time?
[3] **A:** Yes, I'm sure they were done at
[4] the same time.
[5] **Q:** Would the system require that they
[6] be done the same time?
[7] **A:** No.
[8] **Q:** Once the entry for the repriced
[9] warrants is made on the warrant ledger, what if
[10] anything happens next?
[11] **MR. FRIED:** Generally you
[12] are asking about because you are
[13] going back and forth, which is fine.
[14] **Q:** Let's talk about in general. What
[15] is the next step?
[16] **A:** Next step is we would print hard
[17] copies of the new warrants and then I would sign
[18] them and then they would be sent out.
[19] **Q:** Does the transfer agent play any
[20] role whatsoever with respect to the issuance of
[21] repriced warrants?
[22] **A:** No.
[23] **Q:** Are copies of the repriced
[24] warrants in any form, electronic or hard, sent
[25] to the transfer agent?

Page 48

Norman

[2] A: No.
[3] Q: Does the transfer agent keep any
[4] ledger at all that would reflect warrants that
[5] are outstanding for Local.com?
[6] A: I don't believe so.
[7] Q: Is it part of the engagement
[8] agreement with the transfer agent for the
[9] transfer agent to have any role at all with
[10] respect to maintaining warrants issued by
[11] Local.com?
[12] A: No.
[13] Q: With respect to the Hearst
[14] transaction, who would have created the physical
[15] repriced warrant?
[16] A: David Katzoff.
[17] Q: Do you know what the time delay
[18] was, if any, between the time the warrant ledger
[19] was changed to reflect the new warrants and the
[20] creation of the physical new warrants?
[21] A: No, I don't know if there was a
[22] time delay.
[23] Q: In the normal course, do the two
[24] things happen close in proximity in time?
[25] A: Yes.

Page 49

Norman

[2] Q: Once the new warrant is created,
[3] is it then in the normal course delivered to the
[4] warrant holder?
[5] A: Yes.
[6] Q: Is there normally a delay in time
[7] between the time of the creation of the new
[8] warrant and delivery to the warrant holder?
[9] A: Yes.
[10] Q: What is the normal delay in time?
[11] A: Short order, depending on delivery
[12] mechanism.
[13] Q: Assuming there was physical
[14] delivery, mail, FedEx, something like that,
[15] would that happen the same day or the next day?
[16] A: Yes.
[17] Q: Do you know how in fact with
[18] respect to the Hearst warrants — how they were
[19] delivered to Hearst?
[20] A: No, I don't remember.
[21] Q: Do you know who would have sent
[22] the certificates — the repriced warrants to
[23] Hearst?
[24] A: David Katzoff.
[25] Q: You don't know whether he did

Page 50

Norman

[2] that?
[3] A: No.
[4] Q: Would there be any documents or
[5] records at Local.com that would reflect when he
[6] created the repriced warrant and when the
[7] repriced warrant was delivered to Hearst?
[8] MR. FRIED: Object to the
[9] form.
[10] Q: Do you understand the question?
[11] A: Yes.
[12] Q: What records would those be?
[13] A: I would believe, depending on how
[14] we delivered, such as FedEx, I would imagine
[15] there would be some record in our FedEx account.
[16] Q: Do you know whether there would be
[17] a transmittal note or letter that would go along
[18] with the repriced warrants?
[19] A: There might be, like a cover
[20] letter.
[21] Q: In the normal course, would such a
[22] cover letter be signed by you or David Katzoff
[23] or someone else?
[24] A: Probably David Katzoff.
[25] Q: Would you review it before it was

Page 51

Norman

[2] sent out?
[3] A: No.
[4] Q: Does the warrant ledger keep a
[5] real time tally of the number of warrants that
[6] are outstanding?
[7] A: Yes.
[8] Q: From Local.com's perspective, the
[9] warrant ledger is the official record of what
[10] warrants are outstanding; is that correct?
[11] MR. FRIED: Object to the
[12] form.
[13] A: Yes.
[14] Q: Is there any other place that you
[15] would go at Local.com or anywhere else to
[16] determine the number of outstanding warrants?
[17] A: No.
[18] Q: When you report — when Local.com
[19] reports to the SEC, what source does it use to
[20] determine the number of outstanding warrants?
[21] A: The warrant ledger.
[22] Q: Describe to me when you look at
[23] the warrant ledger what it would say. What is
[24] its contents?
[25] A: It has dates on it. It has a

Page 52

Norman

[2] description of the event, such as issuance or
[3] option exercise or warrant exercise. Then it
[4] would have a number of shares for that
[5] particular event and then it would have
[6] cumulative shares. It also has calculations for
[7] weighted average shares.
[8]  MR. MANSFIELD: We would
[9] call for the — withdrawn.
[10]  Q: Is it possible at Local.com with
[11] respect to its warrant ledger to print out the
[12] ledger for a particular date?
[13]  A: No — are you asking is there a
[14] way to determine whether how many shares were
[15] outstanding at a particular date or whether I
[16] can go back and say what the ledger exactly
[17] looked like at a previous date?
[18]  Q: Can you tell me what the warrant
[19] ledger would look like on July 31, 2007?
[20]  A: Can I tell what you it looks like?
[21]  Q: Is there a hard copy of it?
[22]  A: I'm not sure.
[23]  MR. MANSFIELD: I would call
[24] for the production of the warrant
[25] ledger for July 31, 2007, for

Page 53

Norman

[2] August 1, 2007 and for the month end
[3] August 31, 2007.
[4]  MR. FRIED: We will take it
[5] under advisement.
[6]   Is this a good place to take
[7] a break, Alan? It's been an hour
[8] and a half, but I don't know where
[9] you are.
[10]  MR. MANSFIELD: Sure.
[11]   (Whereupon, at 11:25 o'clock
[12] a.m., a recess was taken to 11:40
[13] o'clock a.m.)
[14]   (The deposition resumed with
[15] all parties present.)
[16] DOUGLAS NORMAN, resumed and
[17] testified further as follows:
[18]       BY MR. MANSFIELD:
[19]  Q: Are you ready to proceed?
[20]  A: Yes.
[21]  Q: Mr. Norman, clarify for the record
[22] from the point of view of Local.com is the
[23] official registry of its outstanding common
[24] shares the one it maintains in the Excel
[25] spreadsheet or is it the one that's maintained

Page 54

Norman

[2] by the transfer agent?
[3]  MR. FRIED: Object to the
[4] form.
[5]  Q: Do you understand the question?
[6]  A: Yes, I understand the question.
[7] Again, depending on the purpose, we will use
[8] ours — our ledger.
[9]  Q: For purposes of reporting the
[10] number of common shares outstanding issued and
[11] outstanding on the books and records of
[12] Local.com, for those purposes, which source do
[13] you consult?
[14]  A: My internal ledger.
[15]  Q: Other than for the preparation of
[16] the annual report, is there any time that you
[17] consult the registry maintained by the transfer
[18] agent?
[19]  A: I would say yes, as it relates to
[20] confirming our ledger as well.
[21]  Q: So you use that for information to
[22] see whether your ledger is correct?
[23]  A: For example, during an annual
[24] audit, when I have my independent accountants
[25] audit our ledger and our records, they would

Page 55

Norman

[2] want confirmation of the transfer agent's shares
[3] outstanding as well.
[4]  Q: For purposes of the corporate tax
[5] return, which ledger do you consult for
[6] determining the number of shares of Local.com?
[7]  A: Our internal.
[8]  Q: It was your testimony that with
[9] respect to the repriced Hearst warrants you do
[10] not know when the warrant ledger was updated; is
[11] that right?
[12]  MR. FRIED: I object to the
[13] form. I don't think that
[14] characterizes his testimony
[15] accurately.
[16]  Q: There came a time that there was
[17] an entry made in the warrant ledger maintained
[18] by Local.com with respect to the repriced
[19] warrants issued to Hearst; is that correct?
[20]  A: Yes.
[21]  Q: Is it your testimony you do not
[22] know what time the entry in the warrant ledger
[23] was made?
[24]  A: Yes.
[25]  Q: Is it your testimony you don't

Page 56

[1] **Norman**
[2] know what day it was made?
[3] A: No, I do not know what day it was
[4] made.
[5] Q: Is it your testimony that David
[6] Katzoff would be the only one to know that
[7] information?
[8] A: Yes.
[9] Q: With respect to the 2,356,900
[10] shares, do you know if the transfer agent's
[11] register ever reflected those shares?
[12] A: Do I know if the transfer agent's
[13] records reflect those shares?
[14] Q: Yes.
[15] A: Yes.
[16] Q: They do?
[17] A: Yes, they do.
[18] Q: Do you know when the entry was
[19] made in the transfer agent's registry with
[20] respect to those shares?
[21] A: Yes.
[22] Q: When?
[23] A: August 1st, 2007.
[24] Q: Do you know what time on August
[25] 1st, 2007 the transfer agent made entries into

Page 57

[1] **Norman**
[2] its ledger with respect to the 2,356,900 shares?
[3] A: To my knowledge, they do that at
[4] the end of each day.
[5] Q: Do you know whether that was done
[6] on August 1st at the end of the day?
[7] A: No, I do not know.
[8] Q: In fact, there had been
[9] instruction notices given by Local.com to the
[10] transfer agent with respect to the transaction
[11] on July 31, 2007, correct?
[12] A: I'm sorry?
[13] Q: There have been an instruction
[14] notice given by Local.com to the transfer agent
[15] with respect to the 2,356,900 shares on July 31,
[16] 2007, correct?
[17] MR. FRIED: Object to the
[18] form.
[19] A: There was a form of instruction,
[20] yes, but not actual instructions.
[21] Q: Do you know one way or the other
[22] whether — when during the day on either July 31
[23] or August 1, 2007 entries were made by the
[24] transfer agent in its registry with respect to
[25] the 2,356,900 shares?

Page 58

[1] **Norman**
[2] MR. FRIED: Object to the
[3] form.
[4] A: To my knowledge, they were done at
[5] the end of the day on August 1st.
[6] Q: What does the end of the day mean?
[7] A: I'm not sure what time, but I
[8] believe they put them in their register. They
[9] do all of the entries from the day at the end of
[10] the day.
[11] Q: Do you know the process the
[12] transfer agent uses to create physical
[13] certificates?
[14] A: No, I don't.
[15] Q: Do you know whether physical
[16] certificates are created by the transfer agent
[17] after or before the shares are registered by the
[18] transfer agent?
[19] A: I do not know for sure.
[20] Q: Did you talk to the transfer agent
[21] about that with respect to the 2,356,900 shares?
[22] A: No, I did not.
[23] Q: Do you know whether anyone on
[24] behalf of Local.com did have such a conversation
[25] with the transfer agent?

Page 59

[1] **Norman**
[2] A: David Katzoff had a conversation
[3] with Rich Tilton regarding the shares and that's
[4] when we were informed that they, shall I say,
[5] batch process everything at the end of the day.
[6] Q: There came a time that copies of
[7] stock certificates were sent to Local.com by the
[8] transfer agent; is that right?
[9] A: Yes.
[10] Q: Do you know when that happened?
[11] A: At 2:44 p.m. on August 1st.
[12] MR. FRIED: The record
[13] should reflect that the witness is
[14] referring to Plaintiff's — or
[15] Exhibit 5.
[16] Q: Is counsel correct? Is that how
[17] you came up with the time? Is that how you came
[18] up with the time, by reviewing Exhibit 5?
[19] A: Yes.
[20] Q: You didn't have an independent
[21] recollection of that, did you?
[22] A: Not that specific time. I knew it
[23] was done after we had sent instructions over.
[24] Q: Do you know whether the shares
[25] that are associated with the certificates

Page 60

Norman

attached to Exhibit 5 were registered by the transfer agent before 2:44 p.m. Pacific time on August 1, 2007?
   MR. FRIED: Objection, asked and answered.
   MR. MANSFIELD: That question was not asked, I assure you.
   MR. FRIED: You asked the general question if he knew it and he said he didn't. The specific question, I think, is covered by his original answer, but you can answer the question.
   A: I do not have knowledge of that.
   Q: Do you know whether it would be the practice of Local.com's transfer agent to issue hard copies of certificates before the shares associated with those certificates would have been entered into the transfer agent's registry?
   A: I do not know.
   Q: So you don't know whether it happened before or after, correct?

Page 61

Norman

   MR. FRIED: As the general practice?
   A: No, I'm not sure.
   Q: With respect to the 2,356,900 shares, would it be fair to say you don't know one way or the other whether the shares were registered by the transfer agent before or after the creation of the certificates that are attached to Exhibit 5, correct?
   A: Correct.
   MR. MANSFIELD: Why don't we mark this as Exhibit 11.
   (E-mail string was marked as Plaintiff's Exhibit No. 11 for identification, as of this date.)
   MR. LOPEZ: That is?
   MR. MANSFIELD: Forty-two. Why don't we mark this as 12.
   (Bank advices was marked as Plaintiff's Exhibit No. 12 for identification, as of this date.)
   Q: Mr. Norman, you have before you Exhibit 12, documents Bates stamped 293 through

Page 62

Norman

297, which counsel provided us after the deposition began today. Can you identify Exhibit 12?
   A: These are E-mails from the company's bank to Georgia Thompson who is the company's controller.
   Q: When you say the company's bank, do you mean Local.com's bank?
   A: Yes.
   Q: You have in front of you Exhibit 11, correct?
   A: Correct.
   Q: I'd like you to look through that and tell me if you can identify it?
   A: These are advices from the company's bank that were attached to the E-mails.
   Q: The 2,356,900 shares were purchased pursuant to a PIPE, is that correct?
   A: Correct.
   Q: Who were the purchasers?
   A: There were two funds and then within those funds they actually purchased them with specific — I guess sub-funds, you would

Page 63

Norman

say, there's 27 entries and within there, there were more entries.
   Q: For our purposes in this deposition, can we call those funds and the sub-funds the buyers, would we understand each other if we refer to it as the buyers?
   A: Yes.
   Q: The buyers were party to the stock purchase agreement that you discussed earlier today, correct?
   A: Yes.
   Q: And Local.com was the other party, correct?
   A: Yes.
   Q: It was that stock purchase agreement that you said had various conditions of closing, correct?
   A: Yes.
   Q: Do the documents contained in Exhibits 11 and 12 reflect payment made by the buyers pursuant to the stock purchase agreement?
   A: Yes.
   Q: These were payments for the common shares, correct?

Page 64

Norman

[1]
[2] A: Yes.
[3] Q: The payments reflected on Exhibits
[4] 11 and 12 went directly into Local.com's bank
[5] account, correct?
[6] A: Yes.
[7] Q: These payments were not held in
[8] escrow, correct?
[9] A: They were not — they were not
[10] held by an escrow agent.
[11] Q: Is there any document that says
[12] these payments were held in escrow for any
[13] purpose?
[14] A: Well, I would refer to the
[15] securities purchase agreement because there was
[16] obligations on the companies that we have to
[17] fulfill as well as the buyer fulfill.
[18] Q: After the buyer made payment by
[19] wire transfer on August 1st, 2007, was there any
[20] obligation left on the part of the buyers to
[21] comply with the terms of the stock purchase
[22] agreement?
[23] A: I don't believe so.
[24] Q: When was the last of the payments
[25] received by Local.com in its bank account made

Page 65

Norman

[1]
[2] by the buyers on August 1st, 2007?
[3] A: We received notice at 1:06 p.m.
[4] Pacific.
[5] Q: So that would be 4:06 Eastern
[6] Standard Time, correct?
[7] A: Correct.
[8] Q: So as of 4:06 Eastern Standard
[9] Time on August 1, 2007, the buyers had made
[10] payment for the common shares the buyers
[11] purchased under the stock purchase agreement,
[12] correct?
[13] A: Correct.
[14] Q: It's the case, is it not, that
[15] Local.com told the transfer agent to wait before
[16] delivering the certificates until Local.com was
[17] paid, correct?
[18]    MR. FRIED: Object to the
[19] form.
[20] A: Yes. There was an E-mail to
[21] that — I think there was multiple E-mails. One
[22] of them may have referred to payment.
[23] Q: Look at Exhibit 2 and I direct
[24] your attention to the fourth line.
[25]    MR. FRIED: Is there a

Page 66

Norman

[1]
[2] question pending?
[3]    MR. MANSFIELD: I was
[4] directing his attention to Exhibit
[5] 2.
[6] Q: Do you have it?
[7] A: Yes.
[8] Q: Do you see the fourth line of
[9] Exhibit 2 that begins, "Once we receive payment,
[10] I will send over an issuance letter to issue the
[11] shares," do you see that?
[12] A: Yes.
[13] Q: Is that the E-mail exchange to
[14] which you were referring earlier about payment
[15] being the condition before the transfer agent
[16] was to deliver certificates?
[17] A: Payment being a condition.
[18] Q: Was there any other condition told
[19] to the transfer agent other than payment as
[20] relating to the transfer agent's delivery of
[21] certificates?
[22]    MR. FRIED: Reflected on
[23] this E-mail or at all?
[24]    MR. MANSFIELD: At all.
[25] A: Yes — wait, what was the question

Page 67

Norman

[1]
[2] again?
[3]    MR. MANSFIELD: Read back
[4] the question.
[5]    (The record was read.)
[6] A: Yes.
[7] Q: What was that?
[8] A: On Exhibit 3 it refers to or it
[9] states, "You should receive a legal opinion from
[10] Rattan and Tucker". Then it also states,
[11] "Please do not release the certificates until we
[12] give you approval."
[13] Q: Do you know whether Rattan and
[14] Tucker issued a legal opinion?
[15] A: Yes, I do know and, yes, they did.
[16] Q: Was that legal opinion sent to the
[17] transfer agent?
[18] A: I believe so, yes.
[19] Q: Do you know when?
[20] A: No.
[21] Q: Do you know whether it was sent by
[22] Local.com?
[23] A: No, it would be from Rattan and
[24] Tucker.
[25]    MR. MANSFIELD: We would

Page 68

Norman

[2] call for any document reflecting
[3] when Rattan and Tucker sent the
[4] opinion letter referred to in
[5] Exhibit 31 to the transfer agent.
[6]   MR. FRIED: We will take it
[7] under advisement.
[8]   Q: Was there any event after
[9] receiving the last payment at or about 4:06
[10] Eastern Standard Time from the buyers on
[11] August 1, 2007 that Local.com was waiting for
[12] before delivering stock certificates to the
[13] buyers?
[14]   A: Yes.
[15]   Q: What was that?
[16]   A: Filing the 8-K.
[17]   Q: The 8-K occurred at what time?
[18]   A: It was 1:32, was it?
[19]   Q: Was that information conveyed to
[20] the transfer agent?
[21]   A: I do not know.
[22]   Q: You didn't convey that to the
[23] transfer agent, correct?
[24]   A: No.
[25]   Q: Do you know whether David Katzoff

Page 69

Norman

[2] did one way or the other?
[3]   A: He may have verbally.
[4]   Q: Do you know whether he did?
[5]   A: No.
[6]   Q: You said that you were personally
[7] involved in connection with the PIPE
[8] transaction?
[9]   A: Yes.
[10]   Q: Who on the part of the buyers was
[11] involved in the PIPE transaction?
[12]   A: Well, the people in charge of the
[13] funds, whoever at the funds is in charge of the
[14] particular transaction, as well as their
[15] corporate counsel.
[16]   Q: With respect to the issuance and
[17] delivery of stock certificates, is there someone
[18] you can identify who would have been involved in
[19] that part of the transaction on behalf of the
[20] funds?
[21]   A: Regarding — could you clarify?
[22]   Q: The issuance and delivery of stock
[23] certificates.
[24]   A: You mean just the process with the
[25] transfer agent?

Page 70

Norman

[2]   Q: Anything to do with the issuance
[3] and delivery of stock certificates in connection
[4] with the PIPE, what representative or
[5] representatives on behalf of the buyers would
[6] have been involved, to your knowledge?
[7]   A: At Hudson Bay, the gentleman's
[8] name was George Antonoupolos. He was my contact
[9] at Hudson Bay or the contact for the company.
[10]   Q: Do you know where he is located?
[11]   A: Let me look in my address book —
[12] and then their counsel.
[13] A-n-t-o-n-o-u-p-o-l-o-s. He is with Hudson,
[14] H-u-d-s-o-n, Bay, Capital Management. Would you
[15] like a phone number or something for him?
[16]   Q: Do you have an address?
[17]   A: 120 Broadway, 40th floor, 10271.
[18]   Q: While you have your address book
[19] handy, can you tell me the address of David
[20] Katzoff?
[21]   A: I do not have his address, his
[22] home address.
[23]   Q: Do you have a phone number?
[24]   A: Yes, 949-645-3813.
[25]   MR. MANSFIELD: Mr. Fried,

Page 71

Norman

[2] do you know whether you will be
[3] representing David Katzoff and that
[4] he is apparently a consultant but
[5] not an employee of Local.com?
[6]   MR. FRIED: I don't know at
[7] this time. We can look into that
[8] and get back to you.
[9]   Q: Do you have an address for Rich
[10] Tilton?
[11]   MR. FRIED: This will teach
[12] you not to take it out at future
[13] depositions.
[14]   A: 1745 Gardena, G-a-r-d-e-n-a
[15] Avenue, Suite 200, Glendale, G-l-e-n-d-a-l-e,
[16] California, 91204.
[17]   Q: What is the current name of his
[18] employer?
[19]   A: Computer Share.
[20]   Q: Mr. Norman, I will ask you to look
[21] at Exhibit 1. Do you have that?
[22]   A: Yes.
[23]   Q: Exhibit 1 attaches transfer agent
[24] instructions, correct?
[25]   MR. FRIED: Object to the