**EXHIBIT T-3**

Page 72

Norman

[2] form.
[3] A: Attaches the form of, yes.
[4] Q: It's signed by you, correct?
[5] A: Yes.
[6] Q: This was countersigned, was it
[7] not, by Rich Tilton?
[8] A: Yes.
[9] Q: It was countersigned by Rich
[10] Tilton before 4:32 on August 1, 2007, correct?
[11] A: I'm not sure of the date and time.
[12] Q: Do you know what a stop transfer
[13] instruction is?
[14] A: I have an idea.
[15] Q: Do you know what a stock transfer
[16] instruction is as that phrase is used in the
[17] transfer agent instructions dated July 31, 2007?
[18] A: I don't see it referenced in here.
[19] Q: Why don't you turn to Bates stamp
[20] page 5. This is exhibit 1. In the second
[21] paragraph, do you see a phrase, "Subject to any
[22] stop transfer instructions"?
[23] A: Yes.
[24] Q: Do you know what that means?
[25] A: That means we could issue

Page 73

Norman

[2] instructions to him not to effect a transfer of
[3] these shares under particular circumstances.
[4] Q: Was that done in this case?
[5] A: No.
[6] Q: Looking back to the first page of
[7] Exhibit 1, Mr. Lopez went through these exhibits
[8] and that one in particular with you this
[9] morning. This is an E-mail between David
[10] Katzoff and Rich Tilton, correct?
[11] A: Yes.
[12] Q: You weren't copied on this E-mail,
[13] right?
[14] A: No.
[15] Q: Did you see it prior to making a
[16] collection of documents for purposes of this
[17] lawsuit?
[18] A: Well, yes, because I signed it.
[19] Q: You signed the E-mail?
[20] A: Oh, I'm sorry. No.
[21] Q: Had you seen the E-mail before
[22] preparation for this deposition?
[23] A: No.
[24] Q: Turning to Exhibit 2, you hadn't
[25] seen that E-mail either before preparation of

Page 74

Norman

[2] this deposition; isn't that true?
[3] A: No.
[4] Q: You had seen it?
[5] A: Yes.
[6] Q: Had you seen it or not?
[7] A: No, I had not seen it.
[8] Q: Indeed, had you seen any of the
[9] E-mails between David Katzoff and Rich Tilton
[10] that were issued on July 31, 2007 or August 1,
[11] 2007 prior to preparation for this deposition?
[12] A: No, I had not seen the E-mails.
[13] Q: Why don't you turn to Exhibit 4.
[14] Do you see the first line that says, "We have
[15] received payment for the common shares," do you
[16] see that?
[17] A: Yes.
[18] Q: "And you may release the
[19] certificates"?
[20] A: Yes.
[21] Q: Is it your understanding that
[22] means that payment was the last condition that
[23] was being awaited prior to the delivery of the
[24] certificates?
[25] A: No, it was not.

Page 75

Norman

[2] Q: Is that what this E-mail says?
[3] MR. FRIED: Objection, the
[4] document speaks for itself.
[5] A: No, it just says we have received
[6] payments. Separately it says, you may issue the
[7] shares.
[8] Q: At 1:45 Pacific time — withdrawn.
[9] Do you know whether the reference
[10] in Exhibit 4 to having received payment relates
[11] to the statement in Exhibit 2 that says, "Once
[12] we receive payment I will send over an issuance
[13] letter to issue the shares," do you know whether
[14] those two things relate?
[15] A: Well, they both refer to payments.
[16] Q: They both refer to issuance of
[17] shares upon payment, correct?
[18] A: One does. The other one — the
[19] one at 1:45 just states two different things.
[20] Q: Do you know whether the payment
[21] that's referred to on Exhibit 4 relates to the
[22] same payment that is described on Exhibit 2?
[23] A: Yes.
[24] Q: It does describe the same payment?
[25] A: Yes.

Page 76

Norman

Q: Does Local.com in its books and records distinguish between issued shares and outstanding shares?

A: Do we distinguish? To my knowledge, no — well, to my knowledge, yes, because — issue and outstanding, yes.

Q: I'm not quite sure I understand your answer.

A: There is an SEC and accounting phrase reference to issued and outstanding. To my knowledge, I don't know the distinction of what underlies that whole phrase.

Q: The Excel ledger, that's what we have been referring to as the electronic stock book for Local.com, correct?

A: Yes.

Q: Does the Excel ledger distinguish between issued shares versus outstanding shares?

A: No.

Q: Do you know whether the transfer agent's registry distinguishes between issued shares and outstanding shares?

A: No.

Q: You —

Page 77

Norman

A: No, I do not know.

Q: You do not know, but you do get — I think you said once a year a copy of the transfer agent's registry, correct?

A: Correct.

Q: You get that in preparation for the annual meeting, correct?

A: Correct.

MR. MANSFIELD: We call for a copy of the last registry form submitted by the transfer agent to Local.com.

MR. FRIED: I will take it under advisement.

Q: That's a document that you see in the normal course of your responsibilities, correct?

A: Yes.

Q: Do you know whether that document refers to the term issued shares?

A: I'm not sure what the exact terminology refers to.

Q: You don't know whether it refers to outstanding shares, correct?

Page 78

Norman

A: No.

Q: Would it be fair to say with respect to Local.com's books and records there is no separate ledger that refers simply to outstanding shares; is that true?

A: True, there is no other ledger. There is only one ledger.

Q: That ledger doesn't specifically refer to issued versus outstanding shares, correct?

A: Correct.

Q: Do you know whether, for purposes — for business purposes or tax reporting purposes, Local.com distinguishes between issued and outstanding shares?

A: I do not believe we do.

Q: Given your responsibilities as a CFO, to the extent that that distinction is made, is that something that would be made known to you in the ordinary course of your responsibilities?

A: Yes, and that's why I don't think it applies to us.

Q: Looking again at Exhibit 5 —

Page 79

Norman

MR. FRIED: Do you want to have 2 and 4 in front of him as well?

MR. MANSFIELD: Right now just Exhibit 5.

Q: Exhibit 5 attaches stock certificates that relate to the common shares that were issued pursuant to the PIPE, correct?

A: Yes.

Q: Do you know what time during the day on August 1 these certificates were prepared?

A: No.

Q: Other than Mr. Tilton, do you know anyone who would have information about when the certificates attached to Exhibit 5 would have been prepared?

A: Possibly David Katzoff.

Q: You don't know one way or the other?

A: No.

Q: Did there come a time that physical certificates issued pursuant to the PIPE were delivered to the buyers?

Page 80

Norman

[2] A: Yes.
[3] Q: When was that?
[4] A: I'm not sure.
[5] Q: Who made the delivery of the
[6] physical certificates to the buyers?
[7] A: Rich Tilton effected that.
[8] Q: Do you know the method or manner
[9] in which he effected the delivery of the stock
[10] certificates?
[11] A: No.
[12] Q: Do you know whether delivery was
[13] made on August 1, 2007?
[14] A: No, I do not.
[15] Q: Do you know whether Rich Tilton
[16] had been given delivery instructions as to where
[17] to send the certificates to the buyers in
[18] connection with the PIPE?
[19] A: Yes.
[20] Q: Had he been?
[21] A: Yes.
[22] Q: Do you know whether he had sent —
[23] withdrawn.
[24]     Exhibit 5 attaches a PDF of stock
[25] certificates, correct?

Page 81

Norman

[2] A: Correct.
[3] Q: That's an electronic copy of the
[4] certificates, right? Correct?
[5] A: Correct.
[6] Q: That was something that David
[7] Katzoff had requested from Rich Tilton, correct?
[8] A: I'm not sure if he requested them
[9] or not.
[10] Q: You don't know whether he in an
[11] E-mail specifically said, send me a PDF?
[12] A: I don't know.
[13] Q: Do you know whether a PDF or
[14] physical delivery of stock certificates was made
[15] to the buyers prior to 2:44 p.m. Pacific time?
[16] A: I'm not sure on the PDF, but I
[17] would say no on the physical certificates.
[18] Q: What is your basis for saying no
[19] on the physical certificates?
[20] A: Because if he — I don't know how
[21] he could print and get them to the buyers in
[22] that short period of time.
[23] Q: Did the buyer have a
[24] representative in California for the close up?
[25] A: No.

Page 82

Norman

[2] Q: None of the buyers had a
[3] representative in California; is that right?
[4] A: Correct.
[5] Q: Why don't you look at Exhibit 8.
[6] Exhibit 8 is the NASDAQ form that was completed
[7] by the company, correct?
[8] A: Correct.
[9] Q: You had signed that, right?
[10] A: Correct.
[11] Q: Do you know when this form
[12] reflected in Exhibit 8 was sent to NASDAQ?
[13] A: I believe on August 1st.
[14] Q: Do you know what time?
[15] A: No.
[16] Q: Do you know whether it was before
[17] or after 4:32 Eastern Standard Time?
[18] A: No.
[19] Q: Is there any document in the
[20] possession, custody or control of Local.com that
[21] would provide the information of when Exhibit 8
[22] was sent to NASDAQ?
[23] A: No.
[24] Q: You have no recollection of it,
[25] correct, of the time on August 1?

Page 83

Norman

[2] A: No.
[3] Q: Who completed the NASDAQ form
[4] reflected in Exhibit 8?
[5] A: My counsel.
[6] Q: Did you review it?
[7] A: Yes.
[8] Q: Did you review it for accuracy?
[9] A: Yes.
[10] Q: Who physically sent it to NASDAQ?
[11] A: My counsel did.
[12] Q: Why don't you look at Exhibit 9.
[13] Did you say earlier that Exhibit 9 is prepared
[14] for a monthly close; did you say that?
[15] A: Yes.
[16] Q: Could you tell me what that means?
[17] A: Each month we prepare the
[18] financial statements for the company and this is
[19] one of the statements that we prepare.
[20] Q: Is the source of information
[21] contained in Exhibit 9 the Excel ledger we have
[22] been talking about?
[23] A: For which item?
[24] Q: For the number of common stock
[25] shares outstanding.

Page 84

*Norman*

[1]
[2] A: Yes.
[3] Q: Where do you get the information
[4] about the warrants?
[5] A: In the warrant ledger.
[6] Q: The options?
[7] A: The options, we have a system,
[8] software package.
[9] Q: What does that mean?
[10] A: There is actually a program, an
[11] application for maintaining your stock options.
[12] Q: Does the transfer agent have any
[13] role or responsibility with respect to
[14] maintaining information regarding stock options?
[15] A: No.
[16] MR. MANSFIELD: Mark this as
[17] 13.
[18]    (E-mail string was marked as
[19] Plaintiff's Exhibit No. 13 for
[20] identification, as of this date.)
[21] Q: I am handing you what has been
[22] marked as 13. Do you see the top E-mail on the
[23] page this is Bates No. 18; do you see that?
[24] A: Yes.
[25] Q: This is Tilton to Katzoff saying

Page 85

*Norman*

[1]
[2] on August 1 at 8:28 — that would be Pacific
[3] time, correct?
[4] A: Yes.
[5] Q: And he says, "Give me a call on
[6] this reviewing and signing. An agreement is a
[7] different process than we originally discussed,"
[8] do you see that?
[9] A: Yes.
[10] Q: Do you know what he is talking
[11] about?
[12] A: I believe it has to do with the
[13] transfer agent instructions.
[14] Q: Why don't you look at the second
[15] E-mail on the page and tell me if that refreshes
[16] your recollection?
[17] A: Yes, I still believe it has to do
[18] with the transfer agent instructions.
[19] Q: Other than what's reflected on
[20] Exhibit 13, do you have any independent
[21] knowledge of what it is that Rich Tilton is
[22] talking about?
[23] A: No.
[24] MR. MANSFIELD: Why don't we
[25] mark this as 14.

Page 86

*Norman*

[1]
[2]    (Signature page from
[3] transfer agent was marked as
[4] Plaintiff's Exhibit No. 14 for
[5] identification, as of this date.)
[6] Q: I am handing you what has been
[7] marked as Exhibit 14 which is Bates stamped 19.
[8] Can you identify the second page?
[9] A: It's the instructions — it's a
[10] signature page from the transfer agent.
[11] Q: Before when you referred to the
[12] fact that the transfer agent, indeed, signed the
[13] instruction agreement, is this what you are
[14] referring to?
[15] A: Yes.
[16] Q: Was the instruction pages sent
[17] back to Local.com on August 1 at 9:38 in the
[18] morning Pacific time?
[19] A: Yes.
[20] MR. MANSFIELD: Mark this as
[21] 15.
[22]    (E-mail was marked as
[23] Plaintiff's Exhibit No. 15 for
[24] identification, as of this date.)
[25] Q: I am handing you what has been

Page 87

*Norman*

[1]
[2] marked as Exhibit 15. Can you identify it?
[3] A: It's an E-mail from Rich Tilton to
[4] Doug Norman copying David Katzoff.
[5] Q: It attaches the countersigned
[6] instruction letter, correct?
[7] A: I believe so, yes.
[8] Q: That is sent by Rich Tilton to
[9] you, correct?
[10] A: Correct.
[11] Q: That is at 10:32 Pacific time on
[12] August 1, correct?
[13] A: Yes.
[14] Q: Can you explain why —
[15] A: Just — I note that this looks
[16] different than the one on Exhibit 14.
[17] MR. FRIED: You are saying
[18] that Bates 20 is different from
[19] Bates 30.
[20] Q: Can you explain the difference
[21] between the countersigned instructions on
[22] Exhibit 14 and Exhibit 15?
[23] A: Not right now. I'd like to see
[24] the rest of the document.
[25] Q: You don't know one way or the

Page 88

Norman

[2] other?
[3] A: No.
[4] Q: Do you know why Rich Tilton —
[5] withdrawn.
[6] Had you requested that Rich Tilton
[7] send to you a countersigned version of
[8] instructions?
[9] A: I believe, yes, since that was a
[10] requirement of the securities purchase
[11] agreement.
[12] Q: Do you know why it went to you as
[13] opposed to Katzoff?
[14] A: This particular E-mail went to
[15] both.
[16] MR. FRIED: Referring to
[17] Exhibit 15.
[18] MR. MANSFIELD: Referring to
[19] Exhibit 15, which is the only one.
[20] Q: As I understand, it went to you.
[21] I am asking if you have any understanding as to
[22] why it went to you as opposed to Mr. Katzoff?
[23] A: No.
[24] MR. MANSFIELD: This is 16.
[25] (Copy of a bill was marked

Page 89

Norman

[2] as Plaintiff's Exhibit No. 16 for
[3] identification, as of this date.)
[4] Q: I am handing you what has been
[5] marked as Exhibit 16. Can you identify it?
[6] A: It's a copy of the Cox
[7] Communications bill.
[8] Q: Can you tell me what (818)
[9] 502-1404 is?
[10] A: I believe that is the phone number
[11] for our transfer agent.
[12] Q: Who prepared this document, do you
[13] know?
[14] A: Cox Communications did.
[15] Q: Did you go — you personally look
[16] for documents like this to comply with the
[17] document request?
[18] A: This particular one I asked David
[19] Katzoff to get a copy of the bill.
[20] Q: Did you have any of the
[21] conversations with the transfer agent on July 31
[22] or August 1 that would relate to the entries
[23] made on Exhibit 16?
[24] A: I do not recall.
[25] Q: Do you know whether David Katzoff

Page 90

Norman

[2] had communications with the transfer agent on
[3] July 31 and August 1 reflected on Exhibit 16?
[4] A: Most likely, yes.
[5] Q: Did he tell you what the sum and
[6] substance of the conversations was on those two
[7] dates?
[8] A: I do not recall.
[9] Q: Did the Local.com board of
[10] directors meet on July 31, 2007?
[11] A: Yes.
[12] Q: Were there minutes taken of the
[13] meeting?
[14] A: Yes.
[15] Q: What happened at the meeting?
[16] First, were you present?
[17] A: Yes.
[18] Q: What happened at the meeting?
[19] A: We have an agenda and we go
[20] through the agenda.
[21] Q: Are the agendas of board meetings
[22] maintained by Local.com?
[23] A: Yes.
[24] Q: Does Local.com prepare a board
[25] book as that term is commonly used for board

Page 91

Norman

[2] meetings?
[3] A: Yes, we have the records of the
[4] board meetings.
[5] Q: Aside from the agenda, are there
[6] other materials that are given to the attendees
[7] in advance of the board meeting?
[8] A: Yes.
[9] Q: Are those compiled in some form?
[10] A: Yes.
[11] Q: Is there a particular name that
[12] Local.com gives to that compilation of materials
[13] given to board members prior to the board
[14] meeting?
[15] A: The board package.
[16] Q: Does Local.com maintain board
[17] packages?
[18] A: Yes.
[19] Q: Minutes are taken of board
[20] meetings, correct?
[21] A: Yes.
[22] MR. MANSFIELD: We would
[23] call for the production of the board
[24] packages and minutes of the July 31
[25] board meeting.

Page 92

**Norman**

Q: Let me ask, do the board packages that were prepared for the July 31 meeting contain any materials that related to the PIPE?
A: I do not recall.
Q: Do you know whether they contained any material relating to the Hearst repriced warrants?
A: I do not know.
Q: Do you know whether that was on the agenda for July 31?
A: Yes.
Q: Was it on the agenda?
A: Yes.
MR. MANSFIELD: We would call for the production of the board packages and minutes as I described.
MR. FRIED: I will take it under advisement.
Q: Was it a face-to-face meeting?
A: Face-to-face.
Q: There was also a board meeting held on July 20, 2007; is that right?
A: Yes.
Q: Have you produced all of the

Page 93

**Norman**

minutes in connection with that board meeting?
A: I believe so, yes.
Q: Were there board packages that were created for that July 20, 2007 meeting as well?
A: Yes.
MR. MANSFIELD: We would call for the production of the board packages.
MR. FRIED: I will take it under advisement.
Q: Were there any board meetings between July 20, 2007 and July 31, 2007?
A: There were not.
Q: Prior to July 20, 2007, were there any board meetings which touched on the subject of the buyer's PIPE that we have been talking about or the repricing of the Hearst warrants?
A: I don't believe so.
MR. MANSFIELD: To the extent that any such board meeting did touch on either of those subjects, we would call for the agenda minutes and board packages

Page 94

**Norman**

that related to those subjects.
MR. FRIED: I will take it under advisement.
MR. MANSFIELD: Mark this as 17.
(E-mail was marked as Plaintiff's Exhibit No. 17 for identification, as of this date.)
Q: I am handing you what has been marked as Exhibit 17. Can you identify it?
A: It is an E-mail from Rich Tilton to David Katzoff.
Q: Do you know whether Bates pages 64 and 65 go together?
A: Yes.
Q: They do?
A: They do.
Q: Do you know how on July 31 — do you know whether on July 31 at 3:49 Pacific time Tilton provided this information to Katzoff?
A: It was a requirement in the securities purchase agreement.
Q: What was the requirement?
A: To have the shares — to have, I

Page 95

**Norman**

guess, confirmation from the transfer agent.
Q: Confirmation about what?
A: About outstanding shares.
Q: And authorized shares?
A: Yes.
Q: Do you know why you sought this information from the transfer agent as opposed to referring to the Excel ledger maintained by Local.com?
A: It was probably a requirement of the securities purchase agreement.
Q: Do you know one way or the other whether that was true?
A: I believe so.
Q: Do you have a recollection that that was a provision —
A: Yes.
Q: — of the SPA?
A: Yes.
Q: Does Exhibit 17 refresh your recollection as to whether a distinction is made by the transfer agent between issued shares and outstanding shares?
A: I do not believe there is a

Page 96

Norman

[2] distinction.
[3]   Q: Do you know one way or the other
[4] whether there is a distinction?
[5]   A: No.
[6]   MR. MANSFIELD: Off the
[7] record.
[8]   (Off the record.)
[9]   MR. MANSFIELD: We will take
[10] ten minutes.
[11]   (Whereupon, at 12:50 o'clock
[12] p.m., a recess was taken to 1:15
[13] o'clock p.m.)
[14]   (The deposition resumed with
[15] all parties present.)
[16]   MR. MANSFIELD: Subject to
[17] our receiving additional documents
[18] we requested, we have no further
[19] questions at this time.
[20]   In the event that you choose
[21] voluntarily to give us those
[22] documents, to the extent that we
[23] would have some more questions for
[24] the witness about them, I suspect it
[25] won't be very much, perhaps on the

Page 97

Norman

[2] telephone to make it convenient for
[3] everyone.
[4]   MR. FRIED: That sounds
[5] fine.
[6]   MR. LOPEZ: I have three
[7] questions, possibly four.
[8]   MR. MANSFIELD: Your turn.
[9]   DOUGLAS NORMAN, resumed and
[10] testified further as follows:
[11]        REDIRECT EXAMINATION BY MR. LOPEZ:
[12]   Q: Subsequent to August 1, 2007, has
[13] a reconciliation been made between the Excel
[14] spreadsheet and the transfer agent's records?
[15]   A: Depends on the definition of
[16] reconciliation —
[17]   Q: Let me clarify it, then.
[18] Subsequent to August 1, 2007, has a discrepancy
[19] been detected between the shares outstanding as
[20] shown on the Excel program and the transfer
[21] agent — agent's records?
[22]   A: Has there been a —
[23]   Q: Have the two disagreed?
[24]   MR. MANSFIELD: Which two
[25] disagreed?

Page 98

Norman

[2]   MR. LOPEZ: The Excel
[3] program and the transfer agent's
[4] records.
[5]   A: At certain times, they would
[6] disagree.
[7]   Q: Not hypothetically. Since
[8] August 1, 2007, have they disagreed?
[9]   A: Yes.
[10]   Q: When was the disagreement
[11] discovered?
[12]   A: I would like to answer that in a
[13] different way.
[14]   Q: Be my guest.
[15]   A: There is a process that happens
[16] and we would update our Excel spreadsheet had
[17] an — when an event happens. And then, when the
[18] transfer agent actually issues the shares, then
[19] his system would be updated, so there could be a
[20] time lag at any given time that there is a share
[21] that is issued.
[22]   Q: How much of a time lag are we
[23] looking at?
[24]   A: I would think maybe a couple of
[25] days.

Page 99

Norman

[2]   Q: What has the magnitude of
[3] discrepancy been?
[4]   A: Immaterial.
[5]   Q: What would you define as
[6] immaterial?
[7]   A: Define —
[8]   Q: We will try it differently.
[9] Hundreds of shares?
[10]   A: No, it would be as small as a
[11] hundred shares. It depends on the transaction
[12] and how many shares were transacted.
[13]   Q: At July 31 and August 1, did
[14] Local.com have any shares issued but held in
[15] treasury?
[16]   A: No.
[17]   Q: The board meeting of July 31, was
[18] counsel in attendance?
[19]   A: Yes.
[20]   MR. LOPEZ: That's all. I
[21] have no further questions.
[22]   MR. MANSFIELD: Subject to
[23] what I said earlier, we have no
[24] further questions at this time.
[25]

Page 100

[1] Norman
[2] MR. FRIED: Great. Thank
[3] you.
[4] MR. MANSFIELD: Thank you,
[5] Mr. Norman.
[6] (Whereupon, at 1:30 o'clock
[7] p.m., the deposition was concluded.)

Page 101

CAPTION

[4] The Deposition of DOUGLAS NORMAN, taken in the
[5] matter, on the date, and at the time and place set
[6] out on the title page hereof.

[9] It was requested that the deposition be taken by
[10] the reporter and that same be reduced to
[11] typewritten form.

[14] The Deponent will read and sign the transcript
[15] of said deposition.

Page 102

[2] CERTIFICATE
[4] STATE OF_____ :
[5] COUNTY/CITY OF_____ :
[7] Before me, this day, personally appeared
[8] DOUGLAS NORMAN, who, being duly sworn, states
[9] that the foregoing transcript of his/her
[10] Deposition, taken in the matter, on the date, and
[11] at the time and place set out on the title page
[12] hereof, constitutes a true and accurate transcript
[13] of said deposition.

[16] DOUGLAS NORMAN

SUBSCRIBED and SWORN to before me this_____
[20] day of _____, 2008, in the
[21] jurisdiction aforesaid.

[24] My Commission Expires     Notary Public

Page 103

[2] DEPOSITION ERRATA SHEET
RE:
[3] FILE NO.
[4] CASE CAPTION: Donoghue vs. Local.com, et ano
[5] DEPONENT: Douglas Norman
DEPOSITION DATE: May 15, 2008

To the Reporter:
[7] I have read the entire transcript of my Deposition
taken in the captioned matter or the same has been
[8] read to me. I request for the following changes
be entered upon the record for the reasons
[9] indicated.
I have signed my name to the Errata Sheet and the
[10] appropriate Certificate and authorize you to
attach both to the original transcript.

[24] SIGNATURE:_____ DATE:_____
[25] Douglas Norman

**Page 104**

[1]
[2]                    INDEX
[3] Witness           Direct  Cross  Redirect
[4] DOUGLAS NORMAN      3      18     97
[5]           EXHIBITS
[6] For
    Iden.    Description        Page
[7]
[8]  1   E-mail and attachment       5
[9]  2   E-mail                      6
[10] 3   E-mail                      7
[11] 4   E-mail                      9
[12] 5   E-mail                     10
[13] 6   Submission notification    11
[14] 7   Submission notification    13
[15] 8   Notification form          15
[16] 9   Capitalization table       17
[17] 10  Form 8K for Local.com      38
[18] 11  E-mail string              61
[19] 12  Bank advices               61
[20] 13  E-mail string              84
[21] 14  Signature page from transfer agent  86
[22] 15  E-mail                     86
[23] 16  Copy of a bill             89
[24] 17  E-mail                     94
[25]

**Page 105**

[1]
[2]      Instructions Not to Answer
[3] 52
[4] 67
[5] 77
[6] 91
[7] 92
[8] 93
[9] 93
[10]
[11]      May 15, 2008
[12] New York, New York
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 106**

[1]
[2]                 CERTIFICATE
[3] STATE OF NEW YORK        )
[4]                          ) ss.
[5] COUNTY OF NEW YORK )
[6]      I, JANINE FIGLIOZZI, a
[7] Shorthand (Stenotype) Reporter and
[8] Notary Public of the State of New
[9] York, do hereby certify that the
[10] foregoing Deposition, of the witness,
[11] DOUGLAS NORMAN, taken at the time and
[12] place aforesaid, is a true and correct
[13] transcription of my shorthand notes.
[14]      I further certify that I am
[15] neither counsel for nor related to any
[16] party to said action, nor in any wise
[17] interested in the result or outcome
[18] thereof.
[19]      IN WITNESS WHEREOF, I have
[20] hereunto set my hand this 22nd day of
[21] May, 2008.
[22]
[23]
[24]         JANINE FIGLIOZZI
[25]