David Lopez, Esq.
171 Edge of Woods Road
P.O. Box 323
Southampton, New York 11969-0323
Phone:      631.287.5520
Fax:        631.283.4735
E-Mail:     DavidLopezEsq@aol.com
Attorney for Plaintiff

Daniel E. Doherty, Esq.
7300 W. 110th Street, Suite 925
Overland Park, Kansas 66210
Phone:      913.338.7182
Fax:        913.338.7164
E-Mail:     ded-law@ddoherty.net
Attorney for Plaintiff *Pro Hac Vice*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEBORAH DONOGHUE,

                Plaintiff,                07 Civil 8550 (L.B.S.)

- against -

LOCAL.COM CORPORATION and
HEARST COMMUNICATIONS, INC.,

                Defendants.

_____/

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF HER
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
DISMISSING HEARST'S FIRST COUNTERCLAIM
<u>FOR BREACH OF CONTRACT</u>**

# TABLE OF CONTENTS

POINT I.    THE ISSUANCE OF SHARES ON AUGUST 1, 2007 WAS CONTROLLED BY THE TERMS OF THE SECURITIES PURCHASE AGREEMENT WHICH MADE DELIVERY OF COMMON SHARES AMONG THE MANY CONDITIONS TO CLOSING .......................................... 3

POINT II.    HEARST IS SEEKING TO IMPOSE A BREACH OF CONTRACT ON LOCAL.COM WHERE NONE IS POSSIBLE .............................................................................................. 6

POINT III.    PLAINTIFF DOES NOT CLAIM THAT THIRD PARTY INVESTORS (THE BUYERS) BECAME LOCAL.COM SHAREHOLDERS SIMULTANEOUSLY WITH THE FILING OF THE FORM 8-K; THEY BECAME LOCAL.COM SHAREHOLDERS WHEN ALL CONTRACT CONDITIONS WERE MET AND THE SHARES, AS ONE OF THOSE CONDITIONS, WERE DELIVERED ...................................... 7

POINT IV.    A SUMMARY JUDGMENT MOTION TO DISMISS THE FIRST COUNTERCLAIM IS PROPER WHERE EVERY BIT OF EVIDENCE, EVERY BIT OF DISCOVERY AND EVERY BIT OF ARGUMENTATION SUFFICIENT TO DECIDE IT IS ALREADY BEFORE THE COURT ............................. 9

CONCLUSION ................................................................................................................ 10

**POINT I.    THE ISSUANCE OF SHARES ON AUGUST 1, 2007,
WAS CONTROLLED BY THE TERMS OF THE
SECURITIES PURCHASE AGREEMENT WHICH
MADE DELIVERY OF COMMON SHARES AMONG
THE MANY CONDITIONS TO CLOSING**

The sale of shares by Local.com to the institutional buyers ("Buyers") on August 1, 2007, was controlled in all respects by the terms of the Share Purchase Agreement ("SPA"), a copy of which appears as Exhibit D to the Wargo Declaration. Hearst was not a party to that agreement and there is no showing that it was an intended third-party beneficiary. It was for Local.com and the Buyers, not Hearst, to determine when those terms had been satisfied.

At "1. PURCHASE AND SALE OF COMMON SHARES AND WARRANTS", the SPA states that "Subject to the satisfaction (or waiver) of the conditions set forth in Sections 6 and 7 below, the Company shall issue and sell to each Buyer..." shares of common stock. Such sales were contracted to take place at a "Closing". Section 1(c) provided for a Closing Date and *time* or at such other date and *time* as the parties to the PSA might mutually agree. Although the SPA contemplated a formal closing at the offices of named attorneys in New York City, the closing in fact was conducted informally in California by mutual consent in the manner described in the Norman deposition.

Hearst would have payment by the Buyers early in the day on August 1, 2007, constitute that closing. That is not what the SPA says. Payment was one of several pre-conditions to the obligation of Local.com to issue shares, as set out at Section 6 (ii). It was not the sole pre-condition nor would satisfaction of all pre-conditions to Local.com's

obligation to sell constitute the sale. The preconditions to the Buyer's obligation to buy, which appear at Section 7, would also need to be satisfied before the closing could be completed. Among those pre-conditions, appearing at Section 7(i) was the need for Local.com to execute and deliver to the Buyers "(i) ... the Common Shares (in such amounts as such Buyer shall request) and the related Warrants (in such amounts as the Buyer shall request) being purchased by such Buyer at the Closing pursuant to the Agreement [the SPA]." The deliveries adverted to are unmistakably deliveries of share certificates. The springing up of inchoate and disputable equitable rights would not satisfy this contract condition. Nor has any party to the SPA contended otherwise. Only Hearst, a stranger to the contract, conjures up premature ownership rights in favor of the Buyers not evidenced by share deliveries.

Share certificates could not be delivered until they were generated by the transfer agent and instructions to do so did not emanate from Local.com until 13 minutes after the Form 8-K was filed by Local.com with the Securities & Exchange Commission at 4:32 P.M. on August 2007. No physical delivery of shares to the Buyers took place prior to 2:44 P.M., Pacific time, 5:44 Eastern time. *Norman Deposition, Exhbit T to Lopez Declaration, p. 80, l. 12 to p. 81, l. 17.* Accordingly, an essential condition to the obligation of the Buyers to purchase was not satisfied until a distinct lapse of time following the filing of the Form 8-K and the simultaneous effectiveness of the re-pricing of Hearst's warrants.

Additional conditions which could not be met until after the filing of the Form 8-K needed to be met as pre-conditions to the Buyers' obligation to purchase. For example, at Section 7(viii) there is a requirement that "The Company shall have delivered to such

Buyer a certificate, executed by the Secretary of the Company and dated as of the Closing Date, as to (i) the resolutions consistent with Section 3(b) as adopted by the Company's Board of Directors in a form reasonably acceptable to the Buyer ...." Those resolutions authorize the issuance of shares in conformity with the terms of the SPA and the SPA required of Local.com, through its representations at Section 3(d), that the share issuance not "conflict with, or constitute a default ... under any agreement ...." and at Section 3(e) that all requisite consents be obtained. And Section 7(ix) required the Chief Executive Officer of Local.com to certify that "The representations and warranties of the Company shall be true and correct as of the date when made and as of the Closing Date as though made at that *time* ...." With respect to "time" meaning "time", *See: United States v. Will*, 449 U.S. 200, 225 n. 29 (1980) and other cases cited at p. 9 of Plaintiff's Opposition Brief.

    The terms of the Consent, the agreement which Hearst claims in its First Counterclaim to have been breached, require the Form 8-K filing before the Consent became effective. It defies the linear nature of time that a valid and truthful Secretary's Certificate or Chief Executive Officer's Certificate could have been delivered prior to the filing of the Form 8-K or simultaneous with it. In the nature of things, the event must precede certification of the happening of the event.

    Similarly, Section 5(b) requires that Local.com issue irrevocable transfer instructions to its transfer agent and Section 7(iii) makes it a condition to the Buyers' obligation to purchase that a copy of such instructions be delivered to them. We know from the testimony that final instructions for the issuance of the dilutive shares were not e-mailed until 4:45 P.M. Eastern time. *Norman Deposition, Exhibit T to Lopez*

*Declaration, p. 9, l. 4 to p. 10, l. 18; Pltfs Ex 4 on the Deposition, Exhibit V to Declaration of David Lopez in Opposition ....* The time of sending of the transfer instructions has bearing on when the sale took place because the contract among Local.com and the Buyers makes its sending a condition to be satisfied prior to sale.

The delivery of untrue officers' certificates would have not been in conformity with terms of the resolutions adopted by the Board of Directors of Local.com, vitiating the share authorization and making the issuances invalid. Since no shares can be "issued" without valid board authorization, Delaware Corporate Code, Title 8, Sec. 161, no shares can be "outstanding" without board consent. Hearst's position thus seems to be not only that the Buyers' shares were outstanding immediately after payment and prior to the Closing, but that they also were outstanding without board consent.

### POINT II.  HEARST IS SEEKING TO IMPOSE A BREACH OF CONTRACT ON LOCAL.COM WHERE NONE IS POSSIBLE

Heart's attempt to place the purchase earlier in the day on August 1, 2007, notwithstanding that the Closing conditions had not been met, serves two purposes, neither credible nor creditable:

1.  It would, or so Hearst argues, dilute Hearst's shareholdings in Local.com to less than 10% at the moment of the filing of the Form 8-K thus exculpating Hearst from its Section 16(b) liability; and

2.  Notwithstanding Local.com's meticulous adherence to the terms of the Consent, including its awaiting confirmation from the Securities & Exchange Commission that its Form 8-K had been accepted, Hearst would create out of whole cloth a purported breach of the terms of the Consent -- a breach of contract.

6

Hearst would treat the SPA, with its detailed enumeration of conditions that needed to be met before Local.com was obligated to sell and the Buyers were obligated to buy, as a mere bagatelle. There can be little doubt that the Buyers would be surprised to learn that by wiring funds to Local.com they became shareholders thereby waiving all the protections of Section 7 of the SPA. And Local.com would certainly be astonished that by receiving funds, as required by Section 7(ii) of the SPA, it waived the need for the Buyers' representations and warranties to be "true and correct in all material respects as of the date when made and as of the Closing Date as though made at that *time*"; and that it waived all the other obligations of the Buyers set out at Section 6 (iii) of the SPA. But waivers, under the terms of the SPA, must be in writing. There is no waiver by either party in the record. It is not Hearst's place to instruct the parties to the SPA as to their rights contrary to their understanding and in a manner that gives rise to a claim of breach of contract in its favor.

There comes a point when zealous advocacy crosses the line into clutching at straws. Hearst is well past that crossing.

**POINT III.  PLAINTIFF DOES NOT CLAIM THAT THE THIRD PARTY INVESTORS (THE BUYERS) BECAME LOCAL.COM SHAREHOLDERS SIMULTANEOUSLY WITH THE FILING OF THE FORM 8-K; THEY BECAME LOCAL.COM SHAREHOLDERS WHEN ALL CONTRACT CONDITIONS WERE MET AND THE SHARES, AS ONE OF THOSE CONDITIONS, <u>WERE ISSUED AND DELIVERED</u>**

We are at a loss to understand how Hearst's reading of page 9 of Plaintiff's Opposition Brief could lead it to assert that Plaintiff pegs the filing of the Form 8-K as the event that made the Buyers purchasers rather than the event that satisfied one of the

7

pre-conditions to their becoming purchasers. If there is any ambiguity, let us state it one more time: ALL PRECONDITIONS CONTAINED IN SECTIONS 6 AND 7 OF THE SPA, INCLUDING THE ISSUANCE OF SHARE CERTIFICATES, NEEDED TO BE MET AT THE TIME OF CLOSING BEFORE THE BUYERS BECAME SHAREHOLDERS. The filing of the Form 8-K met one of those pre-conditions in that it made the Hearst Consent -- and the warrant re-pricing -- effective. Other conditions are there in the SPA in black and white for anyone to read who wants to.

Even if, contrary to fact, the filing of the Form 8-K and the purchase took place simultaneously, that still would not get Hearst off the hook. Consider a 13% shareholder who purchases 1,000 shares and then, within six months, makes a single sale of enough shares to get him down to a 9.99% ownership. If the purchase was made at a lesser price than the sales, liability under Section 16(b) would surely attach to the sale that took him below 10% ownership. This is the assumption underlying the Supreme Court's decision in *Reliance Electric v. Emerson Electric,* 404 U.S. 418 (1972). There the question was whether a 13% shareholder could break his sales into two parts. The first would get him below the 10% threshold. Could the remainder be sold off free of the strictures of Section 16(b)? The Court held that the second sale was not subject to the short-swing statute because the defendant was no longer a 10% beneficial owner. The important point for purposes of our case is that the parties and all the courts from high to low took it as given that the first sale was within the statute, this even though by the very act of making that sale, which is to say simultaneously with the sale, the defendant became a less-than-10% beneficial owner. Simultaneity of sale and of loss of status did not eliminate liability.

By contrast, *Foremost McKesson v Provident Securities,* 323 U.S. 232 (1976), holds that the purchase that makes one a 10% beneficial owner cannot be matched under Section 16(b) with any opposite way transactions within less than six months. The difference? The statute operates under the presumption that a 10% beneficial owner has access to inside information not available to the general investing public. Whether true or not, access to inside information is presumed. A person just coming into insider status ought not to be burdened with that presumption. A person already wearing that hat should. *See: Roth v. Jennings,* 498 F.3d 499 (2d Cir. 2007).

Hearst was a 20% beneficial owner beginning in February, 2007. It remained a more-than-10% beneficial owner during the period that it sold off more than 1,000,000 Local.com shares beginning in July, 2007, and continued a 10% beneficial owner thereafter until the sale of issuance of August 1, 2007. Even if, contrary to fact, the warrant amendment took place simultaneously with the activation of the Consent, this is a *Reliance Electric* transaction that is matchable against Hearst's massive sales within 6 months.

### POINT IV. A SUMMARY JUDGMENT MOTION TO DISMISS THE FIRST COUNTERCLAIM IS PROPER WHERE EVERY BIT OF EVIDENCE, EVERY BIT OF DISCOVERY AND EVERY BIT OF ARGUMENTATION SUFFICIENT TO DECIDE IT IS ALREADY BEFORE THE COURT

The caption to this point expresses the whole of the argument to be subsumed under it.

Unless it is Hearst's intention to prolong this litigation beyond all reason and on every pretext, the First Counterclaim, which relies entirely on the question of when the sale took place, should, in the interests of judicial economy, be decided on plaintiff's

cross-motion at the same time as the summary judgment motion brought by Hearst resolves that issue one way or the other.

## CONCLUSION

Hearst's "Motion For Summary Judgment" should be denied.

Plaintiff's "Cross-Motion For Partial Summary Judgment Of Dismissal Of The First Counterclaim (Breach Of Contract)" should be granted.

Dated: Southampton, New York
       August 18, 2008

                                                        /s/ David Lopez
                                                        David Lopez, Esq.
                                                        Attorney for Plaintiff

Dated: Overland Park, Kansas
       August 18, 2008

                                                        /s/ Daniel E. Doherty
                                                        Daniel E. Doherty, Esq.
                                                        Attorney for Plaintiff *Pro Hac Vice*